**BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF ADAMS, STATE OF COLORADO, Petitioner**

v.

**COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT, Respondent**

and

Clean Harbors Deer Trail, L.L.C., a Colorado Limited Liability Company, Intervenor–Respondent.

Nos. 07SC977, 07SC978.

Supreme Court of Colorado, En Banc.

Oct. 13, 2009.

Lindquist & Vennum, P.L.L.P., Howard Kenison, Stuart N. Bennett, Denver, Colorado, Attorneys for Petitioner.

John W. Suthers, Attorney General, David E. Kreutzer, First Assistant Attorney General, Jerry W. Goad, Senior Assistant Attorney General, Natural Resources and Environment Section, Denver, Colorado, Attorneys for Respondent.

Faegre & Benson, LLP, David W. Stark, Todd P. Walker, Brandee L. Caswell, Denver, Colorado, Attorneys for Intervenor–Respondent.

Bruce T. Barker, Greeley, Colorado, Attorney for Amicus Curiae Colorado Counties, Inc.

Justice EID delivered the Opinion of the Court.

Adams County ("the County") brought two suits against the Colorado Department of Public Health and Environment ("the Department") for its issuance of a radioactive materials license and a hazardous waste permit to Clean Harbors Deer Trail, L.L.C. ("Clean Harbors"), which intervened on the Department's behalf. In both cases, the trial courts dismissed the suits for lack of standing. The court of appeals upheld both decisions. *Adams County v. Colo. Dep't of Pub. Health and Env't*, 178 P.3d 1217, 1218 (Colo. App.2007) ("*Adams County I*"); *Adams County v. Colo. Dep't of Pub. Health and Env't*, 178 P.3d 1221, 1222 (Colo.App.2007) ("*Adams County II*").

We now reverse and hold that the County has standing to challenge the Department's issuance of the license and permit. Under our decision in *Wimberly v. Ettenberg*, 194 Colo. 163, 168, 570 P.2d 535, 539 (1977), a party has standing if, taking the allegations of the complaint as true, it demonstrates that (1) it has suffered an injury in fact; and (2) the injury was to a "legally protected interest as contemplated by statutory or constitutional provisions." Here, the County has satisfied both requirements. The County also has met specific prudential considerations that we must address because of a county's role vis-à-vis the state.

Under the Low–Level Radioactive Waste Act, § 24–60–2206(3), C.R.S. (2009), and the Hazardous Waste Siting Act, § 25–15–206(1), C.R.S. (2009), the Department may not issue a license or permit to an applicant until the applicant has first applied for and received a Certificate of Designation ("CD")[1] from the county in which the facility is to be located allowing for the disposal of the materials contemplated by the license or permit. In this case, the County has alleged that, notwithstanding the fact that Clean Harbors never applied for nor received such a CD, the Department issued a license and permit to Clean Harbors. The County has therefore alleged an injury in fact to its authority to issue (or to refuse to issue) a CD for the disposal of the materials in question prior to the Department's issuance of a license or permit. The County has satisfied the second step of the *Wimberly* analysis as well because it has alleged an injury to an interest protected by the Low–Level Radioactive Waste Act and the Hazardous Waste Siting Act.

In addition, we hold that the County has met the prudential standing considerations set forth in *Romer v. Board of County Commissioners*, 956 P.2d 566, 573 (Colo.1998), under which a subordinate state agency has no standing to sue the state unless expressly permitted to do so by statute. In this case,

we find that, under the Low–Level Radioactive Waste Act and the Hazardous Waste Siting Act, the County is not a subordinate state agency with regard to the issuance (or non-issuance) of a CD allowing for the disposal of materials contemplated by the license or permit. Instead, the authority to issue a CD is within the discretion of the county in which the disposal facility is to be located. Because we find that the County met the standing requirements of *Wimberly*, as well as our specific prudential considerations, we reverse the court of appeals.

### I.

When called upon to consider whether a party has standing to bring an action, we accept as true the allegations set forth in the complaint. *Dunlap v. Colo. Springs Cablevision*, 829 P.2d 1286, 1289 (Colo.1992).

The Clean Harbors hazardous waste facility ("the Facility") is a private facility that has existed in its current location in Adams County since 1987. Clean Harbors has owned the Facility since 2002. The Department is a state agency charged with, among other things, regulating hazardous and radioactive wastes.

In 1983, the County passed a resolution ("the 1983 Resolution") conditionally approving a Certificate of Designation containing several restrictions. These restrictions prohibited the proposed Facility from accepting radioactive wastes and polychlorinated biphenyls ("PCBs") that contain a proscribed level of hazardous materials.

In March 1987, the Department[2] issued a hazardous waste permit ("the 1987 Permit") to the Facility.[3] The 1987 Permit prohibited the same wastes prohibited by the 1983 Resolution—namely, any radioactive wastes and the proscribed PCBs. In November 1987, the County issued the CD—which had been conditionally approved in the 1983 Resolution— to the Facility, subject to the prohibitions

---

1. A CD is a land use and zoning device by which a county selects sites for waste disposal. *See* § 30–20–102(1), C.R.S. (2009).

2. In 1987, the Department was known as the Colorado Department of Health.

3. At the time, the Facility was owned and operated by Highway 36 Land Development Company, not Clean Harbors.

specified in the 1987 Permit. In 1998, the Department renewed and slightly amended the 1987 Permit to prohibit only radioactive wastes "above background levels," which the amended permit ("the 1998 Permit") defined.

Clean Harbors has owned and operated the Facility since 2002. Following the 2002 change in ownership, the County in 2004 approved the transfer of the Facility's CD to Clean Harbors. The transferred CD remained expressly subject to the conditions of the 1983 Resolution and the limitations in the 1998 Permit.

Beginning in 2005, Clean Harbors sought to become a low-level radioactive waste disposal site. Clean Harbors submitted to the Department an application to renew and amend the 1998 Permit. The County alleges that Clean Harbors proposed to accept and dispose of radioactive materials exceeding the limits defined in the 1987 and 1998 Permits.

In 2005, Clean Harbors also applied to the Department for a radioactive materials license.[4] The County alleges that this license would allow Clean Harbors to accept and dispose of certain low-level radioactive wastes otherwise prohibited by the CD. Because the license purported to authorize the disposal of low-level radioactive wastes, the Department submitted an application to the Rocky Mountain Low–Level Radioactive Waste Board ("Compact Board") to designate the Facility for disposal of radioactive waste pursuant to the Rocky Mountain Low–Level Radioactive Waste Compact ("the Compact").[5] *See* § 24–60–2202, C.R.S. (2009) (discussing Compact Board approval at Article 4).

The County objected to both applications—for the amended permit, and for the radioactive materials license (including the application for the Facility's designation as a regional disposal site under the Compact)—claiming that the permit and license could not be issued until Clean Harbors first applied for and received from the County a CD allowing for the materials contemplated by the license and the permit.

In June 2005, the Compact Board designated the Facility as a regional disposal site under the Compact. In December 2005, the Department issued Clean Harbors the radioactive materials license ("the License") and the renewed hazardous waste permit ("the Permit").

The County filed two lawsuits seeking judicial review of the Department's actions.[6] The County alleged that the Department's issuance of the License contravened the Low–Level Radioactive Waste Act because the types of radioactive waste contemplated by the License were prohibited by Clean Harbors' CD, and that absent a CD allowing those materials the Department was powerless to issue the License. Similarly, the County alleged that the Department's issuance of the Permit contravened the Hazardous Waste Siting Act because the Permit purported to allow hazardous materials otherwise prohibited by Clean Harbors' CD.

The Department moved to dismiss both cases for lack of standing. It argued that the County failed both steps of the analysis for standing set forth in *Wimberly v. Ettenberg*, 194 Colo. 163, 166, 570 P.2d 535, 538 (1977). First, the Department argued that the County had no legally protected rights in either the license issuance procedure or the permit issuance procedure. The Department contended that it was the sole state agency with authority to regulate radioactive materials, and, hence, the County had no legal rights in the license process. The Depart-

---

4. The Department is authorized to issue radioactive material licenses under the Radiation Control Act, § 25–11–103(2), C.R.S. (2009).

5. This Compact is a statutory mechanism by which states—in this case, Colorado, New Mexico, and Nevada—can join together to create regional disposal sites for their low-level radioactive wastes and can prevent such wastes from being imported from outside of their compact. *See* § 24–60–2202, C.R.S. (2009).

6. The County sought review of the License issuance in the District Court for the City and County of Denver pursuant to section 24–4–106(4), C.R.S. (2004) because as a state agency the Department is deemed to be a resident of Denver County. The County sought review of the Permit issuance in the District Court for Adams County pursuant to the Hazardous Waste Siting Act, section 25–15–305(2)(b), C.R.S. (2004), because the Facility is located within Adams County.

ment further argued that it also had exclusive authority to regulate hazardous materials.

Second, the Department argued that the County did not suffer an injury in fact—as required by *Wimberly*—because the County had already issued Clean Harbors a CD for the Facility. If the County believed that Clean Harbors' proposed activities violated its CD, argued the Department, then the only legal avenue for the County to pursue would be to suspend or revoke the CD [7] rather than to seek judicial review of procedures—the issuances of the License and the Permit—in which it played no statutory role.

The Department further argued that specific considerations of prudential standing barred the County from seeking judicial review. Under *Romer v. Board of County Commissioners*, 956 P.2d 566, 573 (Colo. 1998), a subordinate state agency does not have standing for judicial review of a superior agency's actions unless the legislature has expressly authorized such a suit. The Department contended that it was vested with exclusive authority over both radioactive and hazardous materials, making the County a subordinate agency in regards to both the license and permit issuance processes. Furthermore, the Department argued that the General Assembly had provided no express statutory authorization for the County to seek judicial review of the Department's actions. Accordingly, concluded the Department, prudential considerations further barred the County's suits.

Both trial courts granted the motions to dismiss for lack of standing. The court of appeals affirmed the dismissal of both suits.[8] *Adams County I*, 178 P.3d at 1218; *Adams County II*, 178 P.3d at 1222. In addressing the Department's issuances of the License and the Permit, the court of appeals found that the County failed to satisfy *Wimberly's* two-step test for standing, and that specific prudential concerns also militated against standing. *Adams County I*, 178 P.3d at 1219–20; *Adams County II*, 178 P.3d at 1223–25.

The court of appeals held that, under *Wimberly*, the County did not have any legally protected interests in the License or Permit issuances, negating any injury in fact. *Adams County I*, 178 P.3d at 1219; *Adams County II*, 178 P.3d at 1223–24. The court found that the Department has sole statutory "interest" in the License and in the Permit. *Adams County I*, 178 P.3d at 1219 (citing §§ 25–11–103(1) and –103(2)); *Adams County II*, 178 P.3d at 1223 (citing § 25–15–301(1)). The court concluded that the County's only statutory role exists in the CD issuance. According to the court of appeals, after the County had issued the CD to Clean Harbors, the Department became "statutorily authorized to issue a license based upon that CD. At that point, any legally protected right Adams County may have had in the control of the land use was extinguished by virtue of its exercise of its statutory authority in issuing the CD." *Adams County I*, 178 P.3d at 1219; *see also Adams County II*, 178 P.3d at 1223–24 (coming to a similar conclusion regarding the Permit).

Addressing the prudential standing considerations, the court of appeals held that the statutory provisions made clear that the County was a subordinate state agency in matters of radioactive and hazardous waste management. *Adams County I*, 178 P.3d at 1220; *Adams County II*, 178 P.3d at 1224. The court of appeals concluded that, under *Romer*, a subordinate agency (here, the County) was powerless to seek judicial review of a superior agency (here, the Department) absent express statutory authority.

Finally, the court of appeals held that no statutory provisions expressly provided the County with standing. *Adams County I*, 178 P.3d at 1220; *Adams County II*, 178 P.3d at 1224. The court found that under *Romer* the County's actions could not be maintained because the statutes at issue did not "evince a legislative grant to the County of a legal right to seek judicial review of State Department decisions." *Adams County II*, 178 P.3d at 1224 (quoting *Romer*, 956 P.2d at 576) (quotation marks omitted).

---

7. The County has the authority to suspend or revoke the CD. *See* § 25–15–206.5, C.R.S. (2009).

8. The same tribunal issued both opinions on the same day.

Adams County filed a petition for certiorari to review whether the court of appeals erred in holding that the County lacked standing. We granted certiorari, and now reverse.

## II.

■ To decide whether a party meets our standing requirements, we must first determine whether there has been an injury in fact to a legally protected interest. *Wimberly*, 194 Colo. at 168, 570 P.2d at 539. In this case, because of the particular concerns that arise when a county challenges state action, we must also address specific prudential considerations. *See, e.g., Douglas County Bd. of County Comm'rs v. Public Utils. Comm'n*, 829 P.2d 1303, 1309 (Colo.1992).

### A.

■ The *Wimberly* standing analysis revolves around whether the plaintiff has suffered injury in fact to an interest protected by statutory or constitutional provisions so as to constitute an actual controversy. *See Wimberly*, 194 Colo. at 168, 570 P.2d at 539. To satisfy this requirement, a plaintiff must show "that the action complained of has caused or threatens to cause injury to an interest protected by law." *Romer*, 956 P.2d at 572 (citation omitted).

■ The first step in the *Wimberly* analysis is a showing of injury in fact. 194 Colo. at 168, 570 P.2d at 539. That requirement stems from the "limitation on judicial power requiring the presence of an actual controversy, which is demonstrated by real injury." *Douglas County*, 829 P.2d at 1309 (citations omitted). *Wimberly's* second step requires that the injury suffered was to a "legally protected interest as contemplated by statutory or constitutional provisions." 194 Colo. at 168, 570 P.2d at 539.

■ We hold that the County has met the *Wimberly* standing requirements because it has satisfied this two-part test. Under the Low–Level Radioactive Waste Act, § 24–60–2206(3), C.R.S. (2009), and the Hazardous

Waste Siting Act, § 25–15–206(1), C.R.S. (2009), the Department may not issue a license or permit to an applicant until the applicant has first applied for and received a Certificate of Designation from the county in which the facility is to be located allowing for the disposal of materials contemplated by the license or permit. In this case, the County has alleged that, notwithstanding the fact that Clean Harbors never applied for nor received such a CD, the Department issued such a license and permit to Clean Harbors. The County has therefore alleged an injury in fact to its authority to issue (or to refuse to issue) a CD for the disposal of the materials in question prior to the Department's issuance of a license or permit. The County has satisfied the second step of the *Wimberly* analysis as well because it has alleged an injury to an interest protected by the Low–Level Radioactive Waste Act ("the LLRWA") and the Hazardous Waste Siting Act. Accordingly, the County has standing, under the *Wimberly* analysis, to seek review of the Department's actions.

We begin with the procedures regarding the issuance of a license by the Department. Under the LLRWA, any applicant who seeks a license from the Department to operate a low-level radioactive waste facility must first apply to the county for a CD allowing for such an operation. Section 24–60–2206(3) provides:

> Any person who proposes to operate a [low level radioactive waste] facility *shall first apply ... for a certificate of designation to the board of county commissioners* of the county in which the proposed facility site is located. Such site and facility *shall be reviewed and approved* by such board of county commissioners *prior to the issuance of any license [by the Department]* pursuant to [the Radiation Control Act [9]].

(emphases added). Subsection 2206(3) therefore creates a statutory three-step process for any party applying—as Clean Harbors did starting in 2005—for a license allowing it to accept and dispose of low-level radioactive

---

**9.** The Radiation Control Act contains statutory provisions which, among other things, empower the Department to "issue licenses pertaining to radioactive materials." § 25–11–103(2), C.R.S. (2009).

wastes. First, an applicant must apply for a CD from the county board authorizing the applicant to operate as a low-level radioactive waste disposal facility. Second, the county board must "review[ ] and approve[ ]" the "site and facility" applying for the CD. Third, then—and only then—may the Department issue a radioactive materials license that purports to allow for the disposal of low-level radioactive wastes. *Id.* (county approval must occur "prior to the issuance of any license"). In other words, under subsection 2206(3) of the LLRWA, the Department cannot issue a license to a "facility" until it has been designated as such by the county.[10]

Here, the County has alleged that the Department and Clean Harbors skipped the first two steps of subsection 2206(3). First, according to the County, Clean Harbors did not apply for a CD permitting it to become a disposal facility for low level radioactive wastes. Second, the County alleges that it did not "review[ ] and approve[ ]" the "site and facility" proposed by Clean Harbors. To the contrary, the County alleges that once Clean Harbors applied for the License, it objected both to Clean Harbors and to the Department. Despite these objections, the Department issued the License.

The County's complaint challenging the License issuance meets *Wimberly's* two-part test for standing. First, the County alleges that the CD Clean Harbors currently possesses expressly prohibits the low-level radioactive wastes contemplated by the License. Hence, the issuance of the License

purporting to allow for materials otherwise prohibited by the CD caused the County injury in fact. Second, this injury invaded "a legally protected interest as contemplated by statutory ... provisions," *Wimberly,* 194 Colo. at 168, 570 P.2d at 539—namely, the County's right under subsection 2206(3) to pre-approve a proposed facility through issuance of a CD that allows for materials contemplated by the proposed license.

We come to the same conclusions regarding the Department's issuance of the Permit. The Hazardous Waste Siting Act ("the HWSA"), §§ 25–15–101 through –515, C.R.S. (2009), controls the procedures for the Department's issuance of a permit to operate a hazardous waste disposal site. *See U.S. Pollution Control, Inc. v. Bd. of County Comm'rs, Las Animas County,* 714 P.2d 511, 511 (Colo.App.1985) (holding that the HWSA exclusively governs the hazardous waste site application process). To operate a hazardous waste disposal site, a party must first apply to the local governing body (typically, as here, a county board of commissioners) for a CD permitting it to dispose of hazardous waste within the jurisdiction. § 25–15–202(1), C.R.S. (2009) ("Any person desiring to operate a hazardous waste disposal site shall make application for a certificate of designation to the board of county commissioners...."). In deciding whether to issue a CD, the county must consider, for example, whether the proposed use of the facility complies with land use plans and regulations, § 25–15–203(1)(f), C.R.S. (2009), and whether

**10.** The Department and Clean Harbors point out that subsection 24–60–2206(3) applies to a site recommendation made by a county, which was to occur by "January 1, 1984." § 24–60–2206(4). The Department and Clean Harbors argue that, because the County in this case did not make such a recommendation by that date, section 24–60–2206 is inapplicable here. Instead, they argue that section 24–60–2207, which applies to site recommendations made by the Department based on a statewide assessment, should govern. *See* § 24–60–2207(1)(e) ("In the event that no county has recommended a facility site or an application for such site has not been submitted by January 1, 1985, the department shall prepare an alternative plan for facility development.") However, subsection 2207(1)(e) provides that "[s]aid alternative plan shall be submitted to the general assembly no later than January 1, 1986, for review and approval"—which did not occur

in this case. In sum, neither the County nor the Department appears to have complied with the applicable dates. For purposes of our standing analysis, however, it does not matter whether subsection 2206 or 2207 applies. Both reflect a determination by the General Assembly that the Department cannot issue a license to a facility unless that facility has first obtained a certificate of designation from the county allowing for the disposal of materials contemplated by the license. *See* § 24–60–2206(3) ("Any person who proposes to operate a facility shall first apply ... for a certificate of designation to the board of county commissioners of the county in which the proposed facility site is located."); § 24–60–2207(1)(e) ("No facility may be licensed until designated ... by the board of county commissioners of the county in which the proposed facility is to be located.").

the proposed use "would not pose a significant threat to the safety of the public," § 25–15–203(1)(b). In addition, the CD "shall identify the general types of waste which may be accepted or which shall be rejected" at the site. § 25–15–204(1), C.R.S. (2009). Finally, if there is a "substantial change" in the operation of a facility, that change must first be approved by the county. § 25–15–206(1), C.R.S. (2009). In sum, under section 25–15–204(1) of the HWSA, the Department cannot issue a hazardous waste permit to a disposal facility until that facility has received approval, through the issuance of a CD, from the county allowing it to "accept[ ]" the "general types of waste" contemplated by the permit. If the facility proposes a "substantial change" in the types of waste to be accepted, county approval must be obtained under section 25–15–206(1).

In this case, the County alleges that the Permit issued by the Department does not comport with subsection 204(1) because it purports to authorize Clean Harbors to dispose of certain radioactive wastes and PCBs, both of which are types of waste that the CD specifies it cannot accept. Additionally, the County alleges that the acceptance of these wastes, which is expressly prohibited by the CD, is a "substantial change" in the operation of the facility under subsection 206(1), and that therefore the change cannot be made until the county approves of it. The gist of the County's complaint is that the Department issued the Permit despite the fact that Clean Harbors had not obtained a CD permitting it to dispose of these wastes.

As with the License, the County has sufficiently alleged an injury with regard to the Permit under subsections 204(1) and 206(1) to meet our standing requirements under *Wimberly*. First, the County alleges that the CD Clean Harbors possesses expressly prohibits the wastes contemplated by the Permit, and that Clean Harbors has not applied for a modification of the current CD to allow for the "substantial change" in the types of waste accepted by the facility. Hence, the issuance of the Permit purporting to allow for materials otherwise prohibited by the CD caused the County injury in fact. Second, this injury invaded "a legally protected interest as contemplated by statutory . . . provisions," *Wimberly*, 194 Colo. at 168, 570 P.2d at 539—namely, the County's right under subsections 204(1) and 206(1) to control the types of waste to be disposed of by Clean Harbors.

■ In sum, under the applicable statutory provisions, the Department may not issue a license or permit to an applicant until the applicant has first applied for and received a CD from the county allowing the disposal of waste materials contemplated by the license or permit.[11] Here, the County has alleged that the Department issued the License and the Permit to Clean Harbors notwithstanding the fact that it does not possess such a CD. Accordingly, the County has sufficiently alleged an injury in fact to its legally protected interests—namely, its authority to issue (or decline to issue) a CD allowing for the disposal of materials contemplated by the license or permit—and has standing under *Wimberly* to challenge the Department's actions. *See Maurer v. Young Life*, 779 P.2d 1317, 1325 (Colo.1989) ("[A]llegations of harm to a governmental body's institutional interests through a usurpation of authority by another governmental entity are sufficient to constitute injury in fact." (citation omitted)).

The Department urges us to adopt the reasoning of the court of appeals, which held that the County lacks standing because it has alleged no injury in fact. More specifically, the court of appeals held that the County has no "interest" in the license and permit issu-

---

11. We see no support in the statutory language for the proposition that the County's role is limited to merely reviewing, rather than approving, an application for the CD that is required before the Department may issue a license or permit. *See* § 24–60–2206(3), C.R.S. (2009) (requiring that applications be "reviewed *and approved"* by the County) (emphasis added); § 25–15–206(1), C.R.S. (2009) (requiring County "approval" prior to changes in use); § 30–20–119, C.R.S. (2009) (requiring "express written permission" from the County prior to radioactive waste disposal); § 30–20–102(1), C.R.S. (2009) (requiring a prospective site operator to "first obtain" a CD). The Department may be correct that such a limitation on its authority is problematic from a public policy standpoint. However, such public policy concerns are properly addressed to the General Assembly.

ance process; such an interest, the court continued, was in the sole province of the Department. *Adams County I,* 178 P.3d at 1219; *Adams County II,* 178 P.3d at 1223–24. The court concluded that the County's only statutory role exists in the CD issuance. It found that once the County had issued the CD to Clean Harbors, it had exhausted the full extent of its legally protected right, and the Department was then freely "authorized to issue a license based on that CD." *Adams County I,* 178 P.3d at 1219; *see also Adams County II,* 178 P.3d at 1223 (coming to a similar conclusion regarding the Permit). The Department argues that the County's only remedy after issuance of the CD was to revoke or suspend that CD. *See* § 25–15–206.5 (granting counties the power to revoke or suspend a CD upon certain conditions).

We disagree with the court of appeals' reasoning because it ignores the fact that the General Assembly, under both the LLRWA and the HWSA, has carved out an important role for the County in the license and permit issuance process—namely, that a county must first issue a CD to an applicant for a license or permit allowing it to dispose of the types of waste contemplated by the license or permit before such a license or permit may be issued by the Department. Here, the County alleges that such a CD was not obtained by Clean Harbors.

The Department counters with the argument, again adopted by the court of appeals, that Clean Harbors does in fact possess a CD from the County. This, of course, may in fact be true, but it does not help the Department. The County acknowledges that it issued a CD to Clean Harbors allowing it to accept certain types of hazardous wastes. However, the County asserts that the CD it issued to Clean Harbors does not allow it to accept radioactive wastes above background levels or PCBs, and in fact expressly prohibits such wastes. Yet these are precisely the types of wastes that the License and Permit issued by the Department purport to allow. In other words, contrary to the Department's assertion, not just *any CD* issued by the County will support the issuance of a license or permit—rather, an applicant must first receive a CD from the County that allows for

low-level radioactive wastes contemplated by the License and the various radioactive wastes and PCBs contemplated by the Permit.

Finally, we reject the Department's argument that in a situation in which the Department issues a permit and license for the disposal of waste not allowed by the county's CD—a situation alleged by the County in this case—the county's only remedy is to revoke or suspend that CD. This "remedy" proposed by the Department is a hollow one. The County in this case has no reason to, and in fact does not seek to, revoke the CD that it has already issued to Clean Harbors. That is because the CD that it has already issued allows Clean Harbors to dispose of the particular types of waste that the County has determined may properly be disposed of within its borders. The problem is that the License and Permit issued by the Department, as alleged by the County, permit Clean Harbors to dispose of wastes expressly prohibited by the current CD. Thus, the "remedy" proposed by the Department is in fact no remedy at all.

We therefore conclude that the County has sufficiently alleged an injury in fact to a legally protected interest such that it has standing under *Wimberly's* two-part test to bring its claims against the Department.

**B.**

In addition to the *Wimberly* standing requirements, because of a county's role vis-à-vis the state, we must address specific prudential considerations. The prudential aspects of our standing test reflect "judicially self-imposed limits on the exercise of a court's jurisdiction." *City of Greenwood Vill. v. Pet'rs for the Proposed City of Centennial,* 3 P.3d 427, 437 (Colo.2006) (citation and quotation marks omitted). We address prudential considerations to prevent unnecessary intrusion into disputes properly resolved within another branch of government. *See Romer,* 956 P.2d at 573.

"[A statutory] county is not an 'independent governmental entity existing by reason of any inherent sovereign authority of its residents....'" *Bd. of County*

*Comm'rs v. Bainbridge,* 929 P.2d 691, 699 (Colo.1996) (quoting *Bd. of County Comm'rs v. Love,* 172 Colo. 121, 125, 470 P.2d 861, 862 (1970)). Instead, "it is a political subdivision of the state, existing only for the convenient administration of the state government, created to carry out the will of the state." *Id.* (quoting *Love,* 172 Colo. at 125, 470 P.2d at 862) (quotation mark omitted). As such, "counties have only those powers that are expressly granted to them by the Colorado Constitution or by the General Assembly." *Id.* (citation omitted).

Addressing our prudential concerns vis-à-vis a county's standing to challenge state action, we have held that "[i]n the absence of an express statutory right, a subordinate state agency ... lacks standing or any other legal authority to obtain judicial review of an action of a superior state agency...." *Martin v. Dist. Court,* 191 Colo. 107, 109, 550 P.2d 864, 866 (1976) (citations omitted). In this case, we find that, under the Low–Level Radioactive Waste Act and the Hazardous Waste Siting Act, the County is not a subordinate state agency with regard to the issuance (or non-issuance) of a CD allowing for the disposal of materials contemplated by the license or permit. Instead, the authority to issue a CD is within the discretion of the county in which the disposal facility is to be located, and the Department may not issue a license or permit without such a CD.

Two precedents guide our decision—*Douglas County Board of County Commissioners v. Public Utilities Commission,* 829 P.2d 1303 (Colo.1992), and *Romer v. Board of County Commissioners,* 956 P.2d 566 (Colo. 1998). In the *Douglas County* case, the Public Utilities Commission ("PUC") granted an application for a utilities company to upgrade its power transmission lines across Douglas County, which had actively opposed the application in administrative proceedings. 829 P.2d at 1305. Douglas County sought judicial review of the PUC's actions in district court. *Id.* at 1306. The PUC argued that its constitutional grant of power to regulate public utility facilities, *see* Colo. Const., art. XXV, made the PUC the superior state agency for regulating transmissions lines. The PUC argued that the county had no standing to challenge the PUC's actions under "the general rule that counties do not have standing to obtain judicial review of a decision of a superior state agency." *Douglas County,* 829 P.2d at 1309 (citation omitted).

We held that the "general rule" was not applicable to Douglas County's suit. *Id.* Instead, we found that the PUC's authority over transmission lines was "statutorily limited by the requirement that the PUC first determine the reasonableness of any improvement that derogates from [Douglas County's] land use plan." *Id.* at 1310. The statutory scheme in place granted to Douglas County a "*separate power* to enact a land use scheme subject to improvements deemed reasonable by the PUC." *Id.* (emphasis added). Douglas County could challenge the PUC's actions with regard to regulating transmission lines because the PUC's regulations could only *reasonably* derogate from Douglas County's preexisting land use regulations. *Id.* We also found it significant that a statutory provision allowed "each party to [an] action or proceeding before the [PUC]" to appear in review proceedings. *Id.* at 1308 (citing § 40–6–115(1), C.R.S. (1984)). This statutory authority to challenge the PUC's action, coupled with the "separate power" over land use, "confer[red] statutory authority for the county to seek review." *Id.* at 1310.

In *Romer,* we held that Pueblo County "was acting as a subordinate state agency" when it made social service expenditures. 956 P.2d at 574. Due to allegedly burdensome social services expenditures imposed on the counties, Pueblo County sought judicial review of the actions of the Colorado Department of Human Services in order to reduce those expenditures. *Id.* at 568. We held that the prudential concerns we addressed in *Martin* barred standing for Pueblo County to challenge the state's actions. *Id.* at 574 (citing *Martin,* 191 Colo. at 109, 550 P.2d at 866). Pueblo County was the subordinate agency because the Colorado Human Services Code, §§ 26–1–101 to –208, C.R.S.

(1997), was "unmistakably clear in pointing out that a county board is an agent of the state when it makes expenditures for social services." *Romer*, 956 P.2d at 574. We noted that "a county may not adopt a social services budget until it has been submitted to the state for review"; that the "county social services fund must be administered in accordance with state rules"; and that under certain circumstances the state may directly administer the social services programs of the county. *Id.* (citations omitted). In sum, the General Assembly had not created any statutory provisions empowering the county to regulate social services expenditures. It was therefore "acting as a subordinate state agency" in the context of the case. *Id.* In addition, we noted that we could find "no such [statutory] language," *id.* at 576, such as that present in *Douglas County*, permitting suit against the state. *Id.* at 578 (citing *Douglas County*, 829 P.2d at 1306).

We find this case far more analogous to, and thus governed by, *Douglas County*. As discussed above, the General Assembly has conditioned the Department's authority to issue a license or permit on the county's issuance of a CD allowing for the disposal of waste contemplated by the license or permit, and has assigned the authority to issue such a CD exclusively to the county. Similar to the PUC in *Douglas County*, the Department's authority over radioactive and hazardous wastes is thus limited by the County's statutory authority in those areas. Indeed, a county's role in the permit and license issuance process is more pronounced than was the county's role in *Douglas County*, where the PUC was limited by the requirement that its actions could only reasonably deviate from the county's land use scheme. *See* 829 P.2d at 1310. We find that, like the county in *Douglas County*, the County in this case has a "separate power"—namely, the authority to issue (or decline to issue) a CD allowing for the disposal of materials contemplated by the license or permit. *See Douglas County*, 829 P.2d at 1310. Moreover, in contrast to *Romer*, there are no statutory provisions indicating that the County acts as the Department's

"agent" in this regard. *See Romer*, 956 P.2d at 574.

We also note that, as in *Douglas County*, statutory provisions expressly permit suit. Section 25–1–113(1) provides that "any person aggrieved and affected" by Department action "is entitled to judicial review." § 25–1–113(1), C.R.S. (2009); *see also* § 25–15–305(2)(a) C.R.S. (2009) (providing that "any final determination issued by the [D]epartment . . . shall be subject to review"); § 24–4–106(4), C.R.S. (2009) (authorizing "any person adversely affected" by agency action to "commence an action for judicial review"). Moreover, "person" is defined to include a "county." § 24–4–102(12), C.R.S. (2009); § 25–15–101(13), C.R.S. (2009). If anything, this language is more express than that contained in *Douglas County*, as it does not limit judicial review to those who were previously "party to the action or proceeding before the" relevant state department. *See Douglas County*, 829 P.2d at 1308 (citing § 40–6–115(1), C.R.S. (1984)). We therefore find that, read together, these provisions, combined with the County's "separate power" to issue (or not issue) a CD, satisfy the requirements of prudential standing in this context. *See Douglas County*, 829 P.2d at 1308–10.

In coming to a contrary conclusion, the court of appeals relied on the fact that the Department is designated as "the radiation control agency of this state," § 25–11–103(1), as well as "the entity in the state responsible for the regulation of hazardous waste management," § 25–15–301(1). Yet these provisions must be read in harmony with sections 24–60–2206(3) and 25–15–206(1), which carve out an area of exclusive authority for the County with regard to issuing a CD that allows for the disposal of waste contemplated by the License and Permit. Similar to the PUC's authority vis-à-vis Douglas County, the Department has general authority over this area, less the duty specifically assigned by the legislature to the counties. In sum, the General Assembly granted the County an integral and specific role in both the license and permit processes, and further authorized "any person," including a county, to chal-

lenge the Department's actions. Accordingly, the County has met our prudential requirements and has standing to challenge the Department's actions.

We are mindful that generally "the proper forum for intra-executive dispute resolution is the executive branch itself." *Romer*, 956 P.2d at 578. We also are mindful of the fact that we have, for prudential reasons, "narrowly circumscribed the situations" in which counties may bring suit against the state. *Id.* In the circumstances of this case, however, the General Assembly has determined that this dispute is properly one for the courts. We therefore find that the County has prudential standing to challenge the Department's actions in this case.

### III.

We hold that the County has standing both under *Wimberly* and with regard to specific prudential considerations to challenge the Department's issuances of the License and the Permit. We therefore reverse the court of appeals and remand for proceedings consistent with this opinion.

Justice HOBBS concurs in part and dissents in part, and Chief Justice MULLARKEY joins in the concurrence and dissent.

Justice HOBBS, concurring in part and dissenting in part:

I respectfully concur in part and dissent in part. I agree that Adams County ("the County") has standing, but only to challenge the Colorado Department of Public Health and Environment's ("the Department") issuance of the hazardous waste permit and radioactive materials license in the absence of the County first being able to exercise its legally protected right to review an application for a Certificate of Designation ("CD")

for disposal of the wastes contemplated by the facility and to decide whether to issue such a CD. I disagree with the majority's finding that county issuance of a CD is a prerequisite to the Department's issuance of a permit or license because such an interpretation contravenes Colorado's comprehensive statutory scheme for hazardous and low-level radioactive waste disposal and frustrates the Department's duty and authority to implement the Rocky Mountain Low–Level Radioactive Waste Compact ("the Compact"), *codified at* § 24–60–2202, C.R.S. (2009). The Compact obligates party states to open and operate waste disposal facilities sufficient to manage the low-level radioactive waste generated within the region.

### I. Nature of the County's Legally Protected Interest and Scope of Its Standing

Hazardous and low-level radioactive waste disposal in Colorado is governed by a comprehensive statutory scheme.[1] It is a well-established principle of statutory construction that "a provision existing as part of a comprehensive statutory scheme must be understood, when possible, to harmonize the whole." *Frank M. Hall & Co. v. Newsom*, 125 P.3d 444, 448 (Colo.2005).

Particular provisions within the statutory scheme clearly require a facility wishing to dispose of solid, hazardous, or low-level radioactive wastes to apply to the county for a CD. *See* § 30–20–102(1); § 25–15–201(1)–(2); § 24–60–2206(3). This application, and the county's decision, is to occur before the facility applies to the Department for a hazardous waste permit and radioactive materials license authorizing disposal of such wastes. *See* § 25–15–205(1); § 24–60–2206(3). As a result, counties have a legally protected right to receive and review an application for a CD for the wastes contemplated and to decide whether to issue such a CD.

1.  *See* Solid Waste Disposal Act, §§ 30–20–100.5 to –122, C.R.S. (2009); Hazardous Waste Siting Act, §§ 25–15–200.1 to –220, C.R.S. (2009); Hazardous Waste Management Act, §§ 25–15–301 to–327, C.R.S. (2009); Radiation Control Act, §§ 25–11–101 to –203, C.R.S. (2009); Low–Level Radioactive Waste Act, §§ 24–60–2201 to –2212, C.R.S. (2009); Rocky Mountain Low–Level Radioactive Waste Compact, *codified at* § 24–60–2202.

Although the facility in this case had an existing CD, that CD did not cover, and indeed expressly prohibited, disposal of the wastes contemplated by the facility operator. Nevertheless, the Department issued a permit and license for the disposal, despite the fact the operator did not apply for a new or amended CD. Thus, the County suffered injury to its legally protected right because it was denied its statutorily-prescribed opportunity to review an application for a CD for the wastes contemplated by the facility and to decide whether to grant such a CD. The County's standing is limited to challenging the denial of this right.

In finding that county issuance of a CD is a prerequisite to Department issuance of a permit or license, the majority erroneously defines the County's legally protected interest, and therefore the scope of its standing, too broadly. According to the majority, if the County refuses to issue the CD, the Department is powerless to act. To the contrary, particular provisions and the overall intent of the statutory scheme evince a legislative intent that the Department, in such circumstances, be able to freely exercise its authority and expertise in the area of hazardous and low-level radioactive waste disposal.

Section 25–11–103(1) to (2) of the Radiation Control Act and section 24–60–2205(1) of the Low–Level Radioactive Waste Act make clear that the Department is the sole radiation control agency of the state. The General Assembly has charged the Department with dominant authority and expertise in issuing radioactive materials licenses and administering the Compact. § 25–11–103(1)–(2); § 24–60–2205(1). "No other agency or branch of this state shall have such power or authority." § 25–11–103(2). Likewise, section 25–15–301(1) to (2) of the Hazardous Waste Management Act provides that the Department is "the entity in the state responsible for the regulation of hazardous waste management" and for issuance of hazardous waste disposal permits.

The Department's authority and expertise is further evidenced by the fact that the General Assembly placed significant limitations on county discretion to issue a CD. Both the Solid Waste Disposal Act and the Hazardous Waste Siting Act require applications for CDs be referred to the Department for its review and recommendation as to approval or disapproval. *See* §§ 30–20–103 to –104; §§ 25–15–202 to –203.[2]

When read together to harmonize the entire, comprehensive statutory scheme for hazardous and radioactive waste disposal, the provisions granting the counties the right to review applications for CDs and those granting the Department dominant authority and expertise over the disposal of the waste at issue here illustrate a legislative intent that the counties play a limited and subordinate role and that the Department be able to freely exercise its authority and expertise.[3] The correct interpretation of the statutory scheme therefore limits a county's legally protected interest to the opportunity to review an application and to make a decision regarding issuance of a CD for the wastes contemplated. Accordingly, the County's

---

**2.** Section 25–15–203(a) of the Hazardous Waste Siting Act explicitly requires the Department's recommendation of approval before a county can issue a CD. Although the county has broader discretion to issue a CD under the Solid Waste Disposal Act, section 30–20–104(3)(a) of that Act requires the county to incorporate as requirements in the CD any technical conditions of approval made by the Department.

**3.** In contrast, the majority erroneously finds that county issuance of a CD is a prerequisite that limits the Department's authority to issue a permit or license. In so finding, the majority relies primarily on section 24–60–2206(3), which requires that proposed facilities "first apply ... for a certificate of designation to the board of county commissioners" and that the facility "shall be reviewed and approved by such board of county commissioners prior to the issuance of any license...." The majority errs in reading this provision in isolation, where other provisions and the overall intent of the statutory scheme and the Compact do not support such a finding. For example, another subsection of the same provision clarifies the relationship of a county and Department: it requires only that the Department "first cooperate with and provide counties ... the opportunity to recommend facility sites within their boundaries." § 24–60–2206(1).

standing is limited to the injury to this narrow interest.

## II. The Majority's Decision Renders the Department Unable to Comply with the Compact

I disagree with the majority's decision that the Department is powerless to act if a county refuses to issue a CD. Hazardous and low-level radioactive waste disposal is an important state interest within the dominant authority and expertise of the Department, and the Department must be able to freely exercise that authority and expertise to implement the Compact. Therefore, if the County refuses to issue a CD or fails to act in a reasonable time, the Department can proceed to entertain the facility's application pursuant to its authority and expertise and its duty to implement the Compact. As a result, I respectfully dissent from the majority's conclusion that county issuance of a CD is a prerequisite to the Department's issuance of a permit or license for waste disposal.

The majority's conclusion controverts both the Compact and the comprehensive statutory scheme evincing a legislative intent that the Department exercise dominant authority and expertise in the area of hazardous and radioactive waste disposal. Instead, the majority's construction of the statutory scheme functions to prevent the Department from overriding what are in effect local bans that render the Compact inoperative. *Cf. Colo. Mining Ass'n v. Bd. of County Comm'rs of Summit County*, 199 P.3d 718 (Colo.2009) (holding that a local ordinance banning the use of cyanide is impliedly preempted by the Mined Land Reclamation Act). This is especially problematic where, as here, the County is a statutory county—"a political subdivision of the state, existing only for the convenient administration of the state government, created to carry out the will of the state." *Bd. of County Comm'rs of Douglas County v. Bainbridge, Inc.*, 929 P.2d 691, 699 (Colo. 1996).

The majority's decision frustrates the Department's duty to implement the Compact because it effectively renders the Department powerless to approve a site for waste disposal within its borders. The Compact provides that "each state is responsible for providing for the management of low-level radioactive waste generated within its borders. . . ." Rocky Mountain Low–Level Radioactive Waste Compact, art. 1. A primary purpose of the Compact is to "ensure the availability . . . of sufficient facilities for the proper and efficient management of low-level radioactive waste generated within the region. . . ." *Id.* To this end, the Compact obligates party states to open and operate regional facilities. *Id.* art. 3.[4]

Despite the purpose of the Compact and the obligations it imposes upon the Department, the majority's decision allows all counties in Colorado to simply declare, "Not in my back yard!" Surely the General Assembly did not intend such a result. To the contrary, in approving and ratifying the Compact, the General Assembly intended that the Department be able to override a county's decision not to issue a CD for disposal of low-level radioactive wastes.

Accordingly, I respectfully concur in part and dissent in part.

I am authorized to state that CHIEF JUSTICE MULLARKEY joins in this concurrence and dissent.

---

4. Pursuant to its authority in Article 4 of the Compact, the Compact Board already has designated the facility, Clean Harbors, as a regional disposal site.