507 P.3d 1033
2022 COA 5
AURORA URBAN RENEWAL AUTHORITY, Corporex Colorado LLC, Fitzsimons Village Metropolitan District No. 1, Fitzsimons Village Metropolitan District No. 2, and Fitzsimons Village Metropolitan District No. 3, Plaintiffs-Appellants,
v.
PK KAISER, in his official capacity as Arapahoe County Assessor; and JoAnn Groff, in her official capacity as Colorado State Property Tax Administrator, Defendants-Appellees.
Court of Appeals No. 20CA1162
Colorado Court of Appeals, Division II.
Announced January 6, 2022
Kutak Rock LLP, Daniel C. Lynch, Thomas W. Snyder, Thomas A. Isler, Denver, Colorado; Daniel L. Brotzman, City Attorney, Christine McKenney, Senior Assistant City Attorney, Aurora, Colorado, for Plaintiff-Appellant Aurora Urban Renewal Authority
Fairfield and Woods P.C., Craig D. Joyce, Lee Katherine Goldstein, Denver, Colorado, for Plaintiffs-Appellants Corporex Colorado LLC, Fitzsimons Village Metropolitan District No. 1, Fitzsimons Village Metropolitan District No. 2, and Fitzsimons Village Metropolitan District No. 3
Ronald A. Carl, County Attorney, John R. Christofferson, Deputy County Attorney, Benjamin P. Swartzendruber, Senior Assistant County Attorney, Littleton, Colorado, for Defendant-Appellee PK Kaiser
Philip J. Weiser, Attorney General, Robert H. Dodd, First Assistant Attorney General, John H. Ridge, Assistant Attorney General, Jessica E. Ross, Assistant Attorney General, Denver, Colorado, for Defendant-Appellee JoAnn Groff
Brownstein Hyatt Farber Schreck, LLP, Carolynne C. White, Christopher O. Murray, Angela J. Hygh, Denver, Colorado, for Amici Curiae Downtown Colorado, Inc., Colorado Municipal Bond Dealers’ Association, and National Association for Industrial and Office Parks
David W. Broadwell, Laurel Witt, Denver, Colorado, for Amicus Curiae Colorado Municipal League
Hall & Evans, L.L.C., Andrew D. Ringel, Denver, Colorado, for Amicus Curiae Colorado Counties, Inc.
Opinion by JUDGE BERGER
507 P.3d 1037 ¶ 1 This case addresses the financing of urban renewal projects under Colorado's Urban Renewal Law (URL), sections 31-25-101 to - 116, C.R.S. 2021, and, more specifically, the intricacies of Tax Increment Financing (TIF), which is central to the viability of urban renewal projects.
¶ 2 Plaintiff Aurora Urban Renewal Authority appeals the district court's judgment in favor of defendants, the Arapahoe County Assessor (Assessor) and the Colorado Property Tax Administrator (Administrator). Plaintiffs Fitzsimons Village Metropolitan District No. 1, Fitzsimons Village Metropolitan District No. 2, and Fitzsimons Village Metropolitan District No. 3 (collectively, Metro Districts) and Corporex Colorado LLC (Corporex) appeal the district court's judgment dismissing them for lack of standing. We conclude that all of the plaintiffs have standing and that, in one respect, the rules promulgated by the Administrator that govern the assessment of properties in an urban renewal area are contrary to law.
I. Relevant Facts and Procedural History
¶ 3 The URL authorizes the creation of urban renewal authorities like the Aurora Urban Renewal Authority to undertake urban renewal projects aimed at redeveloping slum and blighted areas. §§ 31-25-104, - 105(1)(b), (1)(i)(I), C.R.S. 2021. To fund these projects, the URL authorizes the use of TIF. § 31-25-107(9)(a), C.R.S. 2021.
¶ 4 "TIF uses recently assessed property values in an urban renewal area to establish a base tax value." City of Aurora v. Scott , 2017 COA 24, ¶ 2, 410 P.3d 720 ; § 31-25-107(9)(a)(I). "As property values increase above the base value, increased tax revenues are allocated to the financing of the renewal project. Those revenues are applied to the renewal fund and used to pay down the debt against the project." Scott , ¶ 2 ; § 31-25-107(9)(a)(II).
[T]he property is reassessed in subsequent years for tax purposes in the hopes that the urban renewal plan has increased its value. After all levies are assessed and collected on the subsequent valuation, any incremental increase in the base amount is deemed the result of the urban redevelopment efforts by the municipality and is distributed to the urban renewal authority. E. Grand Cnty. Sch. Dist. No. 2 v. Town of Winter Park , 739 P.2d 862, 864 (Colo. App. 1987) ; accord Northglenn Urb. Renewal Auth. v. Reyes , 2013 COA 24, ¶ 3, 300 P.3d 984.
¶ 5 The statute does not specify precisely how county assessors should calculate base and increment values. Instead, the statute delegates that authority to the Administrator: "The manner and methods by which the requirements of this subsection (9) are to be implemented by county assessors shall be contained in such manuals, appraisal procedures, and instructions, as applicable, that the property tax administrator is authorized to prepare and publish pursuant to section 39-2-109(1)(e), C.R.S. [2021]." § 31-25-107(9)(h).
¶ 6 The Administrator's manuals are titled the Assessors’ Reference Library (Reference Library). See 2 Div. of Prop. Tax'n, Dep't of Loc. Affs., Assessors’ Reference Library § 12, at 12.1-12.36 (rev. Oct. 2021).
¶ 7 The URL also provides that
[i]n the event there is a general reassessment of taxable property valuations in any county including all or part of the urban renewal area subject to division of valuation for assessment under paragraph (a) of this subsection (9) or a change in the sales tax percentage levied in any municipality including all or part of the urban renewal area subject to division of sales taxes under paragraph (a) of this subsection (9), the portions of valuations for assessment or sales taxes under both subparagraphs (I) and (II) of said paragraph (a) shall be proportionately adjusted in accordance with such reassessment or change. § 31-25-107(9)(e).
¶ 8 The Aurora Urban Renewal Authority, Corporex, and the Metro Districts sued the Assessor and Administrator, alleging that the Reference Library's apportionment methodology violates the URL. They sought both declaratory and injunctive relief.
507 P.3d 1038 ¶ 9 The Assessor and Administrator filed comprehensive motions to dismiss, challenging both standing and the merits of the plaintiffs’ claims. The district court resolved the motions to dismiss, ruling as follows:
• the Metro Districts and Corporex lack constitutional standing;
• the Aurora Urban Renewal Authority and the Metro Districts lack prudential standing to sue the Administrator;
• plaintiffs’ claims survived defendants’ contention that they are barred for failure to exhaust administrative remedies; and
• the district court had no authority to grant injunctive relief against the Administrator or the Assessor.
¶ 10 Then, on cross-motions for summary judgment regarding the remaining claims between the Aurora Urban Renewal Authority and the Assessor, the district court reached the merits and construed the statutory term "general reassessment" to include the statutory biennial reassessment of real property and, accordingly, granted summary judgment in favor of the Assessor.
¶ 11 The Metro Districts and Corporex appeal the district court's standing determination. The Aurora Urban Renewal Authority appeals the district court's prudential standing determination (as to the Administrator) and the summary judgment on the merits in favor of the Assessor.
II. All of the Plaintiffs have Constitutional Standing
¶ 12 The Metro Districts and Corporex argue that the district court erred by dismissing them for lack of constitutional standing. We agree.
A. Standing Law ¶ 13 Standing is a question of law, which we review de novo.[1] Ainscough v. Owens , 90 P.3d 851, 854 (Colo. 2004). ¶ 14 Under Colorado law, a plaintiff must satisfy two prongs to establish standing. Id. at 855 ; Wimberly v. Ettenberg , 194 Colo. 163, 168, 570 P.2d 535, 539 (1977). "First, the plaintiff must have suffered an injury in fact, and second, that injury must be to a legally protected interest as contemplated by statutory or constitutional provisions." Bd. of Cnty. Comm'rs v. Colo. Oil & Gas Conservation Comm'n , 81 P.3d 1119, 1122 (Colo. App. 2003).
B. Injury in Fact ¶ 15 The doctrine of standing is not a meaningless hoop that we require plaintiffs to jump through. It embraces both constitutional and prudential considerations. City of Greenwood Village v. Petitioners for Proposed City of Centennial , 3 P.3d 427, 437 (Colo. 2000). The injury-in-fact prong ensures concrete adversity between the parties before the court so that the court's judgment does not devolve into an advisory opinion, which courts do not have jurisdiction to render. Id. ; Tippett v. Johnson , 742 P.2d 314, 315 (Colo. 1987). "This court is not empowered to give advisory opinions based on hypothetical fact situations." Tippett , 742 P.2d at 315. ¶ 16 The supreme court has also instructed that the injury cannot be the "remote possibility of a future injury nor an injury that is overly ‘indirect and incidental’ to the defendant's action." Ainscough , 90 P.3d at 856 (quoting Brotman v. E. Lake Creek Ranch, L.L.P. , 31 P.3d 886, 890-91 (Colo. 2001) ). However, "[i]n Colorado, parties 507 P.3d 1039 to lawsuits benefit from a relatively broad definition of standing." Id. at 855. ¶ 17 Here, there is no real question about concrete adversity. The parties on the opposite sides of this case obviously are adverse to each other in a matter that has great importance to both them and the public at large. Nor is this a taxpayer standing case, which is governed, in part, by different requirements of standing. See TABOR Found. v. Colo. Dep't of Health Care Pol'y & Fin. , 2020 COA 156, ¶¶ 12-14, 487 P.3d 1277.
¶ 18 We also cannot ignore that the claims pleaded by the plaintiffs invoke the Uniform Declaratory Judgments Law, §§ 13-51-101 to - 115, C.R.S. 2021, a remedial statute that must be liberally construed and administered. § 13-51-102, C.R.S. 2021. The interplay between the doctrine of standing and the declaratory judgments law, at times, may be difficult to ascertain, but that is not the case here.
¶ 19 The defendants argue that the Metro Districts have alleged only a remote possibility of a future injury that is not concrete, and that Corporex has alleged only a speculative and indirect future injury.
¶ 20 In their amended complaint, the plaintiffs allege that the Metro Districts "issued bonds based on the legitimate and reasonable expectation that timely completion of the development plan would produce significant increases in the assessed valuation, and hence Incremental Revenues upon which a significant part of the security for the bonds depends." Corporex similarly alleged that it "obligated itself to finance and construct certain improvements within the Urban Renewal Areas ... partially in reliance on the Metro Districts issuing tax increment revenue-supported bonds."
¶ 21 True, the Metro Districts and Corporex have not alleged that their bonds actually are in default. But the fact that the Metro Districts and Corporex have not suffered all conceivable damage is not determinative. ¶ 22 "[T]he required showing of demonstrable injury is somewhat relaxed in declaratory judgment actions." Mt. Emmons Min. Co. v. Town of Crested Butte , 690 P.2d 231, 240 (Colo. 1984). The purpose of a declaratory judgment "is to settle controversies and to afford parties judicial relief from uncertainty and insecurity with respect to their rights and legal relations." Id.
¶ 23 To establish an injury in fact for the purposes of standing in the declaratory judgment context, the supreme court has explained that a plaintiff must "demonstrate that there is an existing legal controversy that can be effectively resolved by a declaratory judgment, and not a mere possibility of a future legal dispute over some issue." Bd. of Cnty. Comm'rs v. Bowen/Edwards Assocs., Inc. , 830 P.2d 1045, 1053 (Colo. 1992).
¶ 24 The Colorado Oil & Gas Conservation Commission division further explained the requirement of injury in fact in the declaratory judgment context:
The injury in fact element of standing need not consist of a direct, pecuniary loss. In the context of administrative action, this element of standing does not require that a party suffer actual injury, as long as the party can demonstrate that the administrative action "threatens to cause" an injury. However, an injury must be sufficiently direct and palpable to allow a court to say with fair assurance that there is an actual controversy proper for judicial resolution.
The injury in fact element of standing is established when the allegations of the complaint, along with any other evidence submitted on the issue of standing, establish that a regulatory scheme threatens to cause injury to the plaintiff's present or imminent activities. 81 P.3d at 1122 (citation omitted).
¶ 25 Plaintiffs have adequately pleaded that the Reference Library, published by the Administrator and applied by the Assessor, has resulted in minimal revenue to the TIF despite great increases in property values. According to the complaint, a methodology that leads to this result jeopardizes the viability of the Aurora Urban Renewal Authority's urban renewal projects.
¶ 26 When the purposes and requirements of the standing doctrine are laid side by side with the declaratory judgments law, we conclude that the Metro Districts and Corporex 507 P.3d 1040 have alleged facts sufficient to demonstrate an injury in fact.[2] C. Legally Protected Interest ¶ 27 The second prong of the standing analysis requires a court to determine "whether the plaintiff has a claim for relief under the constitution, the common law, a statute, or a rule or regulation." Ainscough , 90 P.3d at 856. ¶ 28 The defendants argue that the Metro Districts and Corporex have no legally protected interest under the URL. We agree that Corporex's interest in the apportionment and distribution of TIF revenues may be more attenuated than that of the Metro Districts. But neither Corporex nor the Metro Districts are mere bystanders in the urban renewal process. They are integral participants.
¶ 29 The URL specifically contemplates the involvement of political subdivisions like the Metro Districts in urban renewal plans. The URL grants urban renewal authorities the authority to enter into agreements with other taxing entities like the Metro Districts. § 31-25-107(11). The URL also allows urban renewal authorities to make payments to other entities through agreements executed under the URL. § 31-25-107(9)(a)(II).
¶ 30 While the question of standing is closer as to Corporex for the reasons articulated by the district court, we conclude that Corporex, as well, has standing. The URL specifically contemplates agreements with private enterprises like Corporex. See § 31-25-107(9)(a)(II). "[T]he General Assembly expressed a preference for ameliorating blight through private redevelopment in section 31-25-107(3.5)(g), which provides that an urban renewal plan should ‘afford maximum opportunity ... for the rehabilitation or redevelopment of the urban renewal area by private enterprise .’ " Arvada Urb. Renewal Auth. v. Columbine Pro. Plaza Ass'n , 85 P.3d 1066, 1070-71 (Colo. 2004) (emphasis added) (quoting § 31-25-107(3.5)(g), C.R.S. 2003, now found at § 31-25-107(4)(g) ).
¶ 31 Urban renewal, as contemplated by the URL, cannot be successful without governmental intermediaries like the Metro Districts or private enterprises like Corporex. Because the Metro Districts and Corporex are in the class of entities expressly acknowledged in the URL, we conclude that their alleged injuries were to a "legally protected interest as contemplated by statutory or constitutional provisions." Wimberly , 194 Colo. at 168, 570 P.2d at 539.
¶ 32 Accordingly, we hold that all of the plaintiffs have constitutional standing.
III. The Metro Districts and the Aurora Urban Renewal Authority have Prudential Standing Under the Facts Alleged in the Complaint
¶ 33 As noted, the district court dismissed all claims asserted by the governmental plaintiffs against the Administrator for lack of prudential standing. The Metro Districts and the Aurora Urban Renewal Authority argue that this was error. We agree.
A. Standard of Review and Applicable Law
¶ 34 Standing is a question of law, which we review de novo. Ainscough , 90 P.3d at 854.
¶ 35 In addition to the two-prong constitutional standing test discussed above, the supreme court in Martin v. District Court , 191 Colo. 107, 109, 550 P.2d 864, 866 (1976), "established a rule precluding standing when: (1) the agency seeking judicial review is subordinate to the agency whose decision is sought to be reviewed, and (2) no statutory or constitutional provision confers a right on the subordinate agency to seek judicial review of the superior agency's decision." City of Greenwood Village , 3 P.3d at 438. This 507 P.3d 1041 prudential standing limitation is also referred to as the political subdivision standing doctrine, and it exists "so that courts do not unnecessarily intrude into matters which are more properly committed to resolution in another branch of government." Id. at 437 (citation omitted).[3] ¶ 36 For example, in Romer v. Board of County Commissioners , the supreme court held that a county department of social services was subordinate to the State Department of Human Services with regard to its social services budget and thus could not sue the state department. 956 P.2d 566, 574 (Colo. 1998). The court explained that the Colorado Human Services Code, which states, "[t]he count[ies] ... shall serve as agents of the state department and shall be charged with the administration of public assistance and welfare," was "unmistakably clear in pointing out that a county board is an agent of the state when it makes expenditures for social services." Id. (emphasis in original) (quoting § 26-1-118(1), C.R.S. 2021 ). The court also found it significant that a "county may not adopt a social services budget until it has been submitted to the state for review" and that the "county social services fund must be administered in accordance with state rules." Id.
¶ 37 Similarly, in State, Department of Personnel v. Colorado State Personnel Board , the court reasoned that, even though the department and the board were "distinct entities with separate powers and responsibilities," the director of the department was subordinate to the board because she was "governed by the rules promulgated by" the board. 722 P.2d 1012, 1019 (Colo. 1986) (quoting Colo. Ass'n of Pub. Emps. v. Lamm , 677 P.2d 1350, 1355 (Colo. 1984) ).
B. The Metro Districts Have Standing to Sue the Administrator Under the Facts Alleged in the Complaint ¶ 38 The Administrator argues that it is a superior state agency to the Metro Districts. But unlike the county department of human services in Romer , the Metro Districts are not agents of the Administrator. The Metro Districts are not required to submit their bonds to the Administrator for review. Nor are the Metro Districts charged with administering their bonds in accordance with the Administrator's rules.
¶ 39 Like the Colorado State Personnel Board and the Colorado State Department of Personnel, the Metro Districts and the Administrator are distinct entities with separate powers and responsibilities. However, unlike the director of the Department, the Metro Districts are not governed by rules promulgated by the Administrator for urban renewal projects or TIF. In fact, the Reference Library is only binding on county assessors. Huddleston v. Grand Cnty. Bd. of Equalization , 913 P.2d 15, 17 (Colo. 1996).
¶ 40 Undeterred, the Administrator argues that because the Metro Districts are not independent governmental entities and do not have inherent sovereign authority, they are necessarily inferior to the Administrator. We reject this argument because the Administrator has not cited (and we are not aware of) any authority holding that any political subdivision that lacks independent and sovereign authority is necessarily a subordinate agency for the purposes of the political subdivision standing doctrine.
¶ 41 Accordingly, we hold that the Metro Districts have standing to sue the Administrator under the facts alleged in the complaint.
C. The Aurora Urban Renewal Authority Has Standing to Sue the Administrator and the Assessor Under the Facts Alleged in the Complaint ¶ 42 The Administrator and Assessor further argue that they are superior state agencies to the Aurora Urban Renewal Authority and that the political subdivision standing doctrine precludes the Aurora Urban Renewal Authority's claims.
507 P.3d 1042 ¶ 43 The Aurora Urban Renewal Authority is an urban renewal authority created under section 31-25-104 of the URL. The relationship of the Aurora Urban Renewal Authority to the Administrator or to the Assessor is not the type of agency relationship that existed between the county department of human services and the State Department of Human Services in Rome r . S ee 95 6 P.2d at 574. Th e Aurora Urban Renewal Authority does not have to submit urban renewal plans to the Administrator or the Assessor or otherwise answer to the Administrator or Assessor.
¶ 44 The Administrator argues that the Aurora Urban Renewal Authority is a subordinate agency because it is a public body with no constitutional or statutory authority to act with regard to the calculation or distribution of TIF revenues. However, unlike the director in State, Department of Personnel , the Aurora Urban Renewal Authority is not governed by rules promulgated by the Administrator. See 722 P.2d at 1019. As discussed above, the Reference Library is only binding on the county assessors. Huddleston , 913 P.2d at 17.
¶ 45 The Administrator further argues that the political subdivision standing doctrine is not limited to intra-agency disputes within a vertical hierarchy. In support, the Administrator cites Board of County Commissioners v. Colorado Department of Public Health and Environment , 218 P.3d 336, 337-38 (Colo. 2009) ( Adams County ). But Adams County does not support the Administrator's argument.
¶ 46 In Adams County , the court explained that "the [Colorado Department of Public Health and Environment] may not issue a license or permit to an applicant until the applicant has first applied for and received a Certificate of Designation (‘CD’) from the county." Id. at 338 (footnote omitted). The court reasoned that because the county had a separate power to issue or decline to issue a CD before the Department could issue a license or permit, it was not subordinate to the Department for purposes of the political subdivision standing doctrine. Id. at 346-47.
¶ 47 As in Adams County , the Aurora Urban Renewal Authority and the Administrator have separate statutory powers. The Aurora Urban Renewal Authority exists to "undertake urban renewal projects." § 31-25-105(1)(b). The Administrator prepares and publishes Reference Library manuals. § 31-25-107(9)(h). Without an urban renewal plan, there is no TIF. Therefore, just like the Department was powerless to issue a license or permit before the county issued a CD in Adams County , the Administrator's Reference Library manuals related to TIF calculations are meaningless if an urban renewal authority like the Aurora Urban Renewal Authority doesn't adopt an urban renewal plan financed by TIF. Accordingly, the Aurora Urban Renewal Authority is not a subordinate agency to the Administrator or the Assessor with respect to urban renewal plans or TIF.
¶ 48 For these reasons, we hold that the political subdivision standing doctrine is no impediment to the Aurora Urban Renewal Authority suing the Administrator or the Assessor under the facts pleaded in the complaint, and therefore the Aurora Urban Renewal Authority has prudential standing.
IV. The District Court Correctly Declined to Dismiss the Plaintiffs’ Claims for Failure to Exhaust Administrative Remedies
¶ 49 The Assessor further argues that all of the plaintiffs’ claims are untimely because the plaintiffs did not seek judicial review of the State Board of Equalization action within thirty-five days. The question of whether the plaintiffs were required to exhaust administrative remedies before filing the suit underlying this appeal was preserved.
A. Additional Facts
¶ 50 In October 2016, revisions to Volume 2, Chapter 12, of the Reference Library were discussed at a public hearing. There, the Administrator stated that the interpretation of "general reassessment" and the corresponding methodology used to calculate the base and increment values had been substantially unchanged since 1984. Ultimately, the State Board of Equalization approved minor changes to the TIF allocation procedures (but not the allocation procedures challenged on appeal), the Office of Legislative Legal 507 P.3d 1043 Services reviewed and approved the changes, and the changes went into effect in January 2017.
¶ 51 None of the plaintiffs sought review of these changes under sections 39-9-108 or 24-4-106(4), C.R.S. 2021. Instead, the plaintiffs filed the suit underlying this appeal in June 2018, sixteen months after the thirty-five-day deadline in section 24-4-106(4) had passed.
B. Applicable Law
¶ 52 Under section 24-4-106(4), "any person adversely affected or aggrieved by any agency action may commence an action for judicial review in the district court within thirty-five days after such agency action becomes effective." ¶ 53 In general, a "plaintiff's failure to exhaust administrative remedies may deprive a court of jurisdiction to grant the requested relief." Horrell v. Dep't of Admin. , 861 P.2d 1194, 1197 (Colo. 1993). This rule prevents "piecemeal application for judicial relief and unwarranted interference by the judiciary in the administrative process." Id.
¶ 54 But these policies are not furthered "when available administrative remedies are ill-suited for providing the relief sought and when the matters in controversy consist of questions of law rather than issues committed to administrative discretion and expertise." Id.
¶ 55 In Collopy v. Wildlife Commission , the supreme court upheld the district court's denial of the defendant's motion to dismiss for failure to exhaust administrative remedies. 625 P.2d 994, 998 (Colo. 1981). The court reasoned that the remedies afforded by section 24-4-106(4) were inadequate because the "factual bases for [the plaintiff's constitutional] claim had not arisen and could not be foretold with any confidence when the rule-making hearings were held in 1968." Id. at 1005. Accordingly, the court concluded it would be unjust "[t]o compel [the plaintiff] to litigate this controversy on the basis of a factual record compiled at a hearing conducted several years before the damage constituting the alleged [constitutional violation] occurred." Id.
¶ 56 The Horrell court concluded that the district court erred by dismissing the plaintiffs’ claims for failure to exhaust administrative remedies because the claims challenged the constitutionality of a statute. 861 P.2d at 1197. The supreme court has reached the same result in cases of statutory interpretation. See Hamilton v. City & Cnty. of Denver , 176 Colo. 6, 11-12, 490 P.2d 1289, 1292 (1971) ("The question of whether petitioner is entitled to exemption as a sole surviving son is, as we have seen, solely one of statutory interpretation. The resolution of that issue does not require any particular expertise on the part of the appeal board; the proper interpretation is certainly not a matter of discretion." (quoting McKart v. United States , 395 U.S. 185, 197-99, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) )).
C. Application ¶ 57 The plaintiffs did not seek judicial review within thirty-five days under section 24-4-106(4). However, for two reasons we conclude that even if there was a failure to exhaust administrative remedies, it was not fatal to the plaintiffs’ claims.
¶ 58 First, it is not clear whether the issues underlying the claims brought by the plaintiffs were even at issue in the October 2016 proceeding. Based on the Administrator's statements, the TIF methodology at issue in this case has been included in the Reference Library since 1984. If true, the factual and legal bases for the plaintiffs’ claims had not arisen when the TIF methodology was included in the Reference Library in 1984. More significantly, the urban renewal plan in which the Aurora Urban Renewal Authority, the Metro Districts, and Corporex are involved did not exist in 1984. So, like the court in Collopy , we conclude that it would be unjust to require the plaintiffs to litigate this controversy on the basis of a factual record compiled at a hearing conducted years before the damage constituting the alleged statutory violation occurred.
¶ 59 Second, the issue of whether the TIF methodology in the Reference Library is consistent with the URL presents a question of statutory interpretation. Questions of statutory interpretation are questions of law. 507 P.3d 1044 Smith v. Exec. Custom Homes, Inc. , 230 P.3d 1186, 1189 (Colo. 2010). Like the questions of law in Horrell , Hamilton , and McKart , the ultimate question of whether an administrative regulation is contrary to law is not one committed to agency discretion and expertise. It does not require agency expertise to determine whether the Reference Library is consistent with the URL, and whether the Reference Library should be consistent with the URL is not a matter of agency discretion.
¶ 60 Accordingly, the district court correctly declined to dismiss the plaintiffs’ claims for failure to exhaust administrative remedies.
V. The District Court Erred by Granting Summary Judgment in Favor of the Assessor
¶ 61 Addressing the merits of their claims, the plaintiffs argue that the Reference Library is inconsistent with the URL in two ways. First, plaintiffs argue that the term "general reassessment" in the URL refers only to a change in the "statewide general assessment rate of real property." Second, the plaintiffs argue that the Reference Library's methodology for calculating TIF revenues conflicts with the URL and case law interpreting the URL. According to the plaintiffs, both of these errors divert revenue that would otherwise be available to the Aurora Urban Renewal Authority, frustrating the operation of the URL.
¶ 62 Like the district court, we reject the plaintiffs’ first argument. But, for the reasons stated below, we agree with their second argument.
A. Standard of Review and Preservation
¶ 63 The plaintiffs’ arguments raise questions of statutory interpretation, which we review de novo. See Prairie Mountain Publ'g Co., LLP v. Regents of Univ. of Colo. , 2021 COA 26, ¶ 10, 491 P.3d 472.
¶ 64 The issue of whether the Reference Library conflicts with the URL was preserved for appeal.
B. Principles of Statutory Interpretation ¶ 65 "When interpreting a statute, our primary aim is to effectuate the legislature's intent. To do so, ‘we look to the entire statutory scheme in order to give consistent, harmonious, and sensible effect to all of its parts, and we apply words and phrases in accordance with their plain and ordinary meanings.’ " Nieto v. Clark's Mkt., Inc. , 2021 CO 48, ¶ 12, 488 P.3d 1140 (citing and quoting Bill Barrett Corp. v. Lembke , 2020 CO 73, ¶ 14, 474 P.3d 46 ). "[W]e do not add words to or subtract words from a statute." Id. (quoting People ex rel. Rein v. Meagher , 2020 CO 56, ¶ 22, 465 P.3d 554 ). When the plain language is unambiguous, we apply the statute as written. Id. ; McCoy v. People , 2019 CO 44, ¶ 38, 442 P.3d 379. ¶ 66 However, when the plain language is ambiguous — that is, susceptible of more than one reasonable interpretation — we may look to other interpretive aids to discern the legislature's intent. Nieto , ¶ 13 ; People v. Berry , 2017 COA 65, ¶¶ 13-14, 459 P.3d 578, aff'd , 2020 CO 14, 457 P.3d 597.
C. The Interpretation of the Term "General Reassessment" in the Reference Library is Consistent with the Plain Language of the URL ¶ 67 As discussed above, TIF works by assigning property in the urban renewal plan area two valuations: a base valuation, "representing the valuation immediately prior to the approval of the plan," and an incremental valuation, representing "the valuation subsequent to the approval of the plan." Denver Urb. Renewal Auth. v. Byrne , 618 P.2d 1374, 1378 (Colo. 1980) ; see § 31-25-107(9)(a)(I)-(II).
¶ 68 The URL states the following:
In the event there is a general reassessment of taxable property valuations in any county including all or part of the urban renewal area subject to division of valuation for assessment under paragraph (a) of this subjection (9) or a change in the sales tax percentage levied in any municipality including all or part of the urban renewal area subject to division of sales taxes under paragraph (a) of this subsection (9), 507 P.3d 1045 the portions of valuations for assessment or sales taxes under both subparagraphs (I) and (II) of said paragraph (a) shall be proportionately adjusted in accordance with such reassessment or change. § 31-25-107(9)(e).
¶ 69 We reject, for precisely the reasons articulated by the district court, the plaintiffs’ argument that the term "general reassessment" refers only to a change in the "statewide general assessment rate of real property." Simply put, there is no statutory textual support for that argument. ¶ 70 The statute does not use the term "rate" or in any way indicate that the occurrence of a general reassessment is limited to a change in the statewide general assessment rate. By contrast, the statute uses the term "percentage" when discussing changes to sales tax. The fact that the same subsection specifically mentions a change in "percentage" for sales tax but does not use similar language for property tax is persuasive evidence that if the General Assembly wanted to limit proportional adjustments to a change in the tax rate, it knew how to do so. "Where the legislature could have chosen to restrict the application of a statute, but chose not to, we do not read additional restrictions into the statute." Springer v. City & Cnty. of Denver , 13 P.3d 794, 804 (Colo. 2000).
¶ 71 The plaintiffs’ proposed interpretation also ignores the fact that "general reassessment" also refers to any personal property in the TIF area. Personal property, which is listed and valued separately from real property, is reassessed every year, while real property is currently reassessed every two years. §§ 39-1-104(10.2)(a), (12.3)(a)(I), - 105, C.R.S. 2021. The assessment rate for personal property has changed only once since 1975 — when it was reduced from thirty percent to twenty-nine percent with the passage of the Gallagher Amendment in 1982. Colo. Const. art. X, §§ 3, 15 (repealed 2020). Nothing in the plain language of the statute evidences an intent to limit "general reassessment" to only those instances when the real property assessment rate changes. ¶ 72 Finally, the dictionary definition of the term "general reassessment" supports the defendants’ interpretation. The URL does not define the term "general reassessment." "When a statute does not define its terms but the words used are terms of common usage, we may refer to dictionary definitions to determine the plain and ordinary meanings of those words." Marks v. Koch , 284 P.3d 118, 123 (Colo. App. 2011).
¶ 73 Black's Law Dictionary defines "reassessment" as "[a] reappraisal, revaluation, or review; a recalculation of an amount payable or owed" or "[a]n official revaluation of property, often repeated periodically, for the levying of a tax." Black's Law Dictionary 144 (11th ed. 2019). "General" is defined as "involving, applicable to, or affecting the whole ... not confined by specialization or careful limitation ... concerned or dealing with universal rather than particular aspects." Merriam-Webster Dictionary, https://perma.cc/M2WF-NYER. Combining these dictionary definitions, the plain and ordinary meaning of "general reassessment" is the commonly occurring revaluation. Nothing in the dictionary definitions indicates that the term "general reassessment" is limited only to a change in the statewide general assessment rate of real property. Accordingly, section 31-25-107(9)(e) applies whenever there is a general reassessment (i.e., a commonly occurring revaluation) of property values within the TIF area.
¶ 74 Because this is the only reasonable construction of this statute, we are not at liberty to consider legislative history or use other interpretive aids. Rather, we apply the statute as written. Smith , 230 P.3d at 1189.
¶ 75 We thus conclude that the portions of the Reference Library that allow the Assessor to proportionately adjust the base and increment values any time there is a general reassessment, and not only when the statewide reassessment rate changes, are not contrary to law.
D. The Reference Library's Distinction Between Direct and Indirect Benefits is Contrary to Law
¶ 76 Although it is not plaintiffs’ primary argument, they also challenge, sufficiently to preserve the issue for decision by us, the 507 P.3d 1046 central assumption baked into the Reference Library (but not the URL) that requires the direct and indirect effects of the creation of an urban renewal plan to be allocated differently.[4] 1. The Reference Library's Distinction Between Direct and Indirect Benefits Eviscerates the URL's Express Purpose of Rehabilitating Slum or Blighted Areas ¶ 77 The purpose of the URL, as expressly stated by the General Assembly, is to rehabilitate slum or blighted areas through the creation of urban renewal authorities that undertake urban renewal projects, which are often funded by TIF. §§ 31-25-102, - 104, - 105(1)(b), - 107(9)(a), C.R.S. 2021. As noted, "[w]hen interpreting a statute, our primary aim is to effectuate the legislature's intent." Nieto , ¶ 12. "All general provisions, terms, phrases, and expressions, used in any statute, shall be liberally construed, in order that the true intent and meaning of the general assembly may be fully carried out." § 2-4-212, C.R.S. 2021; see also § 2-4-201, C.R.S. 2021.
¶ 78 The Reference Library distinguishes between reassessment and non-reassessment changes.
Non-reassessment changes are property specific and affect the increment only. Value changes to specific properties are caused by one or more of three events:
1) Changes to the physical characteristics of a property
2) Changes to the legal characteristics of a property
3) Changes in a property's use.
2 Assessors’ Reference Library at 12.15. "A non-reassessment event that impacts the value of property in a TIF area is attributable to the increment...." Id. The Reference Library then instructs that "after accounting for non-reassessment changes, the base and increment are adjusted annually by the change demonstrated within each TIF area due to reassessment." Id. at 12.17.
¶ 79 These distinctions clearly are consistent with the URL and are within the expertise and delegated authority of the Administrator. But the Reference Library also distinguishes between direct and indirect benefits by instructing that "indirect benefits resulting from market perceptions that properties located in a TIF plan are more or less desirable/valuable ... appl[y] proportionately to both the base and increment." Id. at 12.15. As illustrated by the examples contained in the Reference Library, this "proportionate" allocation, whatever it actually means, results in a very small percentage (or sometimes none) of the increase in value caused by the urban renewal plan being allocated to the urban renewal authority. See id. at 12.35-12.36.
¶ 80 "[M]arket perceptions that properties located in a TIF plan are more or less desirable/valuable," id. at 12.15, are conceptually different from general market conditions. Market perceptions that properties located in a TIF plan are more or less desirable or valuable logically are attributable to the TIF plan, not general market conditions. But for the TIF plan, there would be no market perception that a property in the TIF plan was more or less desirable or valuable.
¶ 81 Indeed, it is this illogical distinction between direct and indirect benefits that convinces us that the Reference Library's methodology as currently written and implemented 507 P.3d 1047 is inconsistent with the purpose of the URL. The purpose of the URL is to rehabilitate slum or blighted areas through the creation of urban renewal authorities that undertake urban renewal projects. §§ 31-25-102(2), - 104, - 105(1)(b), - 107(9)(a). It does not effectuate the legislature's intent to credit the base value with the increases in value caused by the urban renewal plan. And the result, the virtual defunding of TIF and urban renewal authorities, makes the objective of the URL impossible to achieve. This is not what the legislature intended.[5] ¶ 82 The Assessor argues that the Reference Library's distinction between direct and indirect benefits is necessary to effectuate the purpose of the URL. Without this distinction, the Assessor argues, "an urban renewal authority could simply attach TIF provisions to tracts of property and then do nothing, while reaping the benefit of market value increases." It is certainly possible that an urban renewal authority could act this way. But any such short-term benefit is illusory because when property owners or investors realize that the plan is not going to be executed, any initial indirect market value increases will evaporate.
¶ 83 Additionally, the defendants do not point to any record evidence suggesting that the distinction between direct and indirect benefits incentivizes urban renewal. Instead, as discussed above, the examples contained in the Reference Library demonstrate that the Reference Library's current methodology results in a very small percentage (or sometimes none) of the increase in value within urban renewal areas being allocated to the urban renewal authority. 2 Assessors’ Reference Library at 12.35-12.36. This eviscerates the URL's express purpose of rehabilitating slum or blighted areas.
¶ 84 We have not been tasked with determining the best method for calculating TIF revenues or the best way to incentivize urban renewal. But we are tasked with determining whether the method chosen (particularly one so obtuse and counterintuitive) is consistent with the stated purposes of a statute enacted by the General Assembly.
2. The URL Does Not Authorize the Reference Library's Distinction Between Direct and Indirect Benefits, at Least as Currently Formulated by the Administrator
¶ 85 Our conclusion that the distinction between direct and indirect benefits eviscerates the express purpose of the URL is buttressed by the fact that nothing in the URL authorizes this distinction, at least in the manner effected by the Reference Library.
¶ 86 The URL distinguishes between base value and incremental value. See § 31-25-107(9)(a)(I)-(II). It makes no distinction between direct and indirect benefits as it pertains to incremental value. By contrast, the Reference Library distinguishes between direct and indirect benefits, instructing that "indirect benefits resulting from market perceptions that properties located in a TIF plan are more or less desirable/valuable ... appl[y] proportionately to both the base and increment." 2 Assessors’ Reference Library at 12.15. No further explanation is provided in the Reference Library as to why this is the case or, as noted above, how such proportionate adjustment is achieved.
¶ 87 The Assessor argues that even though the URL does not expressly permit a distinction between direct and indirect benefits, nothing in the URL expressly prohibits this distinction. The Assessor further argues that section 31-25-107(9)(h) grants the Administrator the authority to distinguish between direct and indirect benefits in the Reference Library.
¶ 88 Section 31-25-107(9)(h) grants the Administrator the authority to prepare and publish the "manner and methods by which the 507 P.3d 1048 requirements of [ section 31-25-107(9) ] are to be implemented by the county assessors." Nothing in section 31-25-107(9)(h) distinguishes between direct and indirect benefits.
¶ 89 The defendants also argue that the Administrator's interpretation of the URL is entitled to deference. See El Paso Cnty. Bd. of Equalization v. Craddock , 850 P.2d 702, 705 (Colo. 1993). We do not question that the General Assembly delegated substantial authority to the Administrator to create rules, binding on county assessors, to effectuate the URL. § 31-25-107(9)(h) ; Huddleston , 913 P.2d at 17. Given that delegation of authority by the legislative branch to the executive branch, we must tread lightly to avoid the potential separation of powers concerns voiced by the district court. See Markwell v. Cooke , 2021 CO 17, ¶¶ 3-4, 482 P.3d 422. And we certainly understand the district court's reluctance to interfere with the "statutorily mandated duties of the Assessor." But that deference has limits. Those limits are exceeded when an administrative regulation renders virtually impossible the statutory purpose. ¶ 90 We are unable to determine exactly what the Reference Library's "proportionate allocation" means or how it is effectuated. This incomprehensibility does not mean that we must defer to the Administrator's regulations. Rather, it is precisely why we should not defer. No authority supports the proposition that complex regulations in complex subject areas are immune from judicial review. Instead, binding authority holds that an agency's interpretation of a statute is only entitled to deference if the interpretation is reasonable. See Craddock , 850 P.2d at 704-05 ; see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc. , 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
¶ 91 The Administrator does not have discretion to interpret terms in a manner inconsistent with the purposes of the statute. See Bd. of Cnty. Comm'rs v. Colo. Pub. Utils. Comm'n , 157 P.3d 1083, 1089 (Colo. 2007). We therefore do not overstep our bounds by holding that the Reference Library's current distinction between direct and indirect benefits is contrary to the URL.
3. Case Law Interpreting the URL Demonstrates that the Reference Library's Distinction Between Direct and Indirect Benefits is Contrary to the URL
¶ 92 The Assessor finally points to the supreme court's Byrne opinion and the definition of "urban renewal project" to support the Reference Library's distinction between direct and indirect benefits.
¶ 93 The Byrne court explained,
To ensure that tax revenues are allocated to [an urban renewal authority] based solely upon the increased valuation of property because of the project , section 31-25-107(9)(e) provides that in the event there is a general reassessment of taxable property within any county including any part of the urban renewal project, the valuation of property within the project area shall be proportionately adjusted in accordance with such assessment. The tax allocation structure has been carefully drafted so that there is a direct relationship between the increased valuation of property within the project area , and thus, increased ad valorem tax revenues, and the project financed by the bond issue. Denver has not lost the benefit of any ad valorem tax revenues which would otherwise have been available for its general revenue purposes had the plan never been adopted. 618 P.2d at 1382 (emphasis added). Byrne further explained, "[t]he portion of tax revenues allocated to [an urban renewal authority] represent the amount generated by virtue of increased property valuation which would not have existed but for the project ." Id. at 1387 (emphasis added). Section 31-25-103(10), C.R.S. 2021, defines an urban renewal project as the "undertakings and activities ... in accordance with an urban renewal plan."
¶ 94 Based on this language from Byrne and the statutory definition of "urban renewal project," the Assessor argues that indirect changes in value attributable to market perceptions that properties located in a TIF plan are more or less desirable or valuable are properly distinguished from direct changes in value attributable to the "undertakings and activities" of an urban renewal project. For two reasons, we disagree that Byrne controls here.
507 P.3d 1049 ¶ 95 First, the Byrn e co urt w as addressing whether TIF was constitutional, not the question of statutory interpretation presented to us. Second, a close look at the language used in Byrn e re veals that the use of the phrases "because of the project" and "but for the project" are not determinative. The Byrn e co urt a lso used the term "project area" and referred to the urban renewal "plan." Accordingly, we conclude that Byrn e do es no t control the outcome here.[6] ¶ 96 Other case law interpreting the URL demonstrates that the Reference Library's distinction between direct and indirect benefits is contrary to the URL. The Winter Park division explained that "[a]fter all levies are assessed and collected on the subsequent valuation, any incremental increase in the base amount is deemed the result of the urban redevelopment efforts by the municipality and is distributed to the urban renewal authority." 739 P.2d at 864 (emphasis added); accord Reyes , ¶ 3.
¶ 97 For all of these reasons, we conclude that, as written, the Reference Library's differential treatment of direct and indirect benefits does not effectuate the central purpose of the URL, is not supported by the text of the URL, and is contrary to case law interpreting the URL. Accordingly, as written, the current distinction in the Reference Library between direct and indirect benefits is contrary to law.
VI. Relief ¶ 98 While the Assessor is bound by the methodology in the Reference Library, Huddleston , 913 P.2d at 17, provisions of the Reference Library that conflict with the URL are void as a matter of law. § 24-4-103(8)(a), C.R.S. 2021 ("Any rule or amendment to an existing rule issued by any agency ... which conflicts with a statute shall be void."); Rigmaiden v. Colo. Dep't of Health Care Pol'y & Fin. , 155 P.3d 498, 504 (Colo. App. 2006). ¶ 99 By holding that, as written, the distinction between direct and indirect benefits in the Reference Library is contrary to the URL, we don't express any opinion on how the Reference Library should be written. It is not our function, nor that of the district court, to rewrite the Reference Library. See Markwell , ¶ 18. But courts have the authority and, when properly presented, the responsibility to declare that administrative regulations are contrary to law. Id.
¶ 100 The Aurora Urban Renewal Authority argues that the district court erred by concluding it lacked authority to issue injunctive relief. We recognize the district court's discretion to enter injunctions, both under the Uniform Declaratory Judgments Law, section 13-51-112, C.R.S. 2021, and under C.R.C.P. 65, but we acknowledge the separation of powers concerns that arise whenever the judicial branch directs specific action by the legislative or executive branches. C.R.C.P. 57(h) ; see Markwell , ¶ 3. To the extent a declaratory judgment is a sufficient remedy, an injunction is unnecessary and unwarranted. But if a properly crafted declaratory judgment does not remedy the law violation that we have concluded exists, the district court retains jurisdiction to enter appropriate injunctions. Langlois v. Bd. of Cnty. Comm'rs , 78 P.3d 1154, 1157 (Colo. App. 2003) ("The grant or denial of injunctive relief lies within the sound discretion of the trial court and will be reversed only upon a showing of an abuse of that discretion.").
VII. Disposition
¶ 101 We reverse the portion of the district court's judgment dismissing the Metro Districts and Corporex for lack of constitutional standing and the district court's ruling that the Metro Districts and the Aurora Urban 507 P.3d 1050 Renewal Authority lacked prudential standing to sue the Administrator.
¶ 102 We affirm the portion of the district court's judgment rejecting dismissal based on a failure to exhaust administrative remedies. We also affirm the portion of the district court's summary judgment construing "general reassessment" to include the biennial reassessment of real property.
¶ 103 But the summary judgment in favor of the Assessor is reversed, and the case is remanded for the entry of an appropriate declaratory judgment in favor of the plaintiffs and against both the Administrator and the Assessor, consistent with this opinion.
CHIEF JUDGE ROMÁN concurs.
JUDGE YUN concurs in part and dissents in part.
JUDGE YUN, concurring in part and dissenting in part.
¶ 104 I agree with most of the majority's opinion. I agree that all the plaintiffs have standing to sue and that they need not exhaust their administrative remedies before bringing their claims against the Arapahoe County Assessor (Assessor) and the Colorado Property Tax Administrator (Administrator). I also agree that the district court correctly construed "general reassessment" under section 31-25-107(9)(e), C.R.S. 2021, to mean the "regularly occurring revaluation of property." But I part ways with the majority when it concludes that the methodology in the Assessors’ Reference Library (Reference Library) of proportionately adjusting the base and increment values is contrary to law. I therefore concur in part and dissent in part.
I. Background
¶ 105 For clarity and context, I include the following statutory framework governing the issues in this case, some of which the majority has already discussed.
A. The Administrator's Authority
¶ 106 The Administrator, who is responsible for administering the property tax laws, is appointed by, and is subject to the supervision and control of, the State Board of Equalization (Board). Colo. Const. art. X, § 15 (2). The Administrator possesses specific statutory duties, powers, and authorities. § 39-2-109, C.R.S. 2021. Among those is the responsibility
[t]o prepare and publish from time to time manuals, appraisal procedures, and instructions, after consultation with the advisory committee to the property tax administrator and the approval of the state board of equalization, concerning the methods of appraising and valuing land, improvements, personal property, and mobile homes and to require their utilization by assessors in valuing and assessing taxable property. § 39-2-109(1)(e).
¶ 107 Pursuant to this statutory authority, the Administrator developed and adopted the Reference Library. See Douglas Cnty. Bd. of Equalization v. Fid. Castle Pines, Ltd. , 890 P.2d 119, 124 (Colo. 1995). In preparing the Reference Library, the Administrator consults with a statutory advisory committee concerning the methods of appraising and valuing property. § 39-2-109(1)(e). The Reference Library is then submitted to the Board for review and approval. § 39-9-103(10)(a)(I), C.R.S. 2021. In doing so, the Board must conduct a public hearing and give stakeholders notice and an opportunity to be heard. § 39-9-102, C.R.S. 2021. Once the Board approves the Reference Library, it is "subject to legislative review, the same as rules and regulations, pursuant to section 24-4-103(8)(d), C.R.S." 2021. § 39-2-109(1)(e). Thus, the Reference Library adopted by the Administrator is a manual authorized by section 39-2-109(1)(e), approved by the Board pursuant to sections 39-9-103(10)(a)(I) and 39-9-102, and subject to review by the General Assembly pursuant to section 24-4-103(8)(d).
B. Colorado's Urban Renewal Law
¶ 108 Against this backdrop, Colorado's Urban Renewal Law (URL) authorizes the use of Tax Increment Financing (TIF) to finance urban renewal projects. § 31-25-107(9)(a). This is accomplished by
first establishing a base amount upon which the various taxing authorities assess 507 P.3d 1051 and collect their levies. This base amount is determined by assessing the value of the property within the urban renewal area prior to adoption of the urban renewal plan. Thereafter, the property is reassessed in subsequent years for tax purposes in the hopes that the urban renewal plan has increased its value. After all levies are assessed and collected on the subsequent valuation, any incremental increase in the base amount is deemed the result of the urban redevelopment efforts by the municipality and is distributed to the urban renewal authority. E. Grand Cnty. Sch. Dist. No. 2 v. Town of Winter Park , 739 P.2d 862, 864 (Colo. App. 1987).
¶ 109 But the URL also provides that
[i]n the event there is a general reassessment of taxable property valuations in any county including all or part of the urban renewal area subject to division of valuation for assessment under paragraph (a) of this subsection (9) ... the portion[ ] of valuation[ ] for assessment ... under ... subparagraph[ ] (I) ... of said paragraph (a) shall be proportionately adjusted in accordance with such reassessment or change . § 31-25-107(9)(e) (emphasis added).
¶ 110 The URL does not specify precisely how county assessors should proportionately adjust the base and increment during the general reassessment of taxable property. Rather, the URL delegates that authority to the Administrator. Specifically, section 31-25-107(9)(h) provides:
The manner and methods by which the requirements of this subsection (9) are to be implemented by county assessors shall be contained in such manuals, appraisal procedures, and instructions, as applicable, that the property tax administrator is authorized to prepare and publish pursuant to section 39-2-109(1)(e), C.R.S.
II. Analysis
¶ 111 The majority concludes that the Administrator's methodology for calculating TIF revenues is contrary to law because "the Reference Library's differential treatment of direct and indirect benefits does not effectuate the central purpose of the URL, is not supported by the text of the URL, and is contrary to case law interpreting the URL." Supra ¶ 97. I respectfully disagree.
¶ 112 It is true that the URL makes no distinction between direct and indirect benefits in valuing taxable property in TIF areas. But as the district court observed, "the URL does not contain an[y] allocation methodology" but rather "expressly dictates that the [Administrator] shall specify how Assessors perform the allocation." See § 31-25-107(9)(h). Pursuant to section 31-25-107(9)(e), the Reference Library provides that "whenever there is a general reassessment of property, the base and increment values are proportionately adjusted in accordance with the reassessment." 2 Div. of Prop. Tax'n, Dep't of Loc. Affs., Assessors’ Reference Library § 12, at 12.13 (rev. Oct. 2021). It then provides as follows:
Non-reassessment changes are property specific and affect the increment only. Value changes to specific properties are caused by one or more of three events:
1) Changes to the physical characteristics of a property
2) Changes to the legal characteristics of a property
3) Changes in a property's use
Typically these events follow the undertaking of a URA [urban renewal authority].... The value, if any, attributed to new development is evidenced by these events. A non-reassessment event that impacts the value of property in a TIF area is attributable to the increment, whether or not such change is demonstrated to be directly caused by undertakings of the URA.... However, indirect benefits resulting from market perceptions that properties located in a TIF plan are more or less desirable/valuable are evidenced when any sort of reassessment event occurs, and such event applies proportionately to both the base and increment.
2 Assessors’ Reference Library at 12.15 (emphasis added).
¶ 113 I cannot say that this method of valuing taxable property — allocating value 507 P.3d 1052 changes directly caused by the urban renewal project to the increment while allocating value changes caused by general market conditions proportionately to the base and increment during the reassessment — is not authorized by the URL. Section 31-25-107(9)(e) does not explain how the value changes "shall be proportionately adjusted" during the reassessment. And this "statutory language is susceptible to more than one reasonable interpretation." El Paso Cnty. Bd. of Equalization v. Craddock , 850 P.2d 702, 705 (Colo. 1993) (giving deference to the property tax administrator's interpretation when the statutory language is susceptible to more than one reasonable interpretation). Thus, in my view, nothing in the URL precludes the Reference Library's differential treatment of direct and indirect benefits.
¶ 114 Meanwhile, the URL entrusts the Administrator with the responsibility for developing "the manner and methods by which the requirements of this subsection (9) are to be implemented." § 31-25-107(9)(h). Pursuant to this authority, the Administrator developed and adopted the Reference Library. And our supreme court has determined that the Administrator's interpretation of the law she is tasked with applying is entitled to deference. It explained,
When construing a statute, courts afford deference to the interpretation given the statute by the officer or agency charged with its administration. Courts, of course, must interpret the law and are not bound by an agency decision that misapplies or misconstrues the law. An administrative agency's construction should be given appropriate deference, but it is not binding on the court. Administrative interpretations are most useful to the court when the subject involved calls for the exercise of technical expertise which the agency possesses and when the statutory language is susceptible to more than one reasonable interpretation. Craddock , 850 P.2d at 704-05 (citations omitted).
¶ 115 The majority acknowledges that "[w]e are unable to determine exactly what the Reference Library's ‘proportionate allocation’ means or how it is effectuated." Supra ¶ 90. That is why we should exercise caution. Because the intricacies of TIF are complex and "call[ ] for the exercise of technical expertise which the [Administrator] ... possesses," Craddock , 850 P.2d at 705, we should defer to the Administrator, who has the constitutional authority to administer the property tax laws in this state, Colo. Const. art. X, § 15 (2).
¶ 116 Nor do I believe that the Reference Library's distinction between direct and indirect benefits is contrary to case law interpreting the URL. In Denver Urban Renewal Authority v. Byrne , 618 P.2d 1374, 1382 (Colo. 1980), the supreme court indicated that the general reassessment provision ensures that property tax revenues related to a TIF project are allocated to the urban renewal authority, while revenues not due to a project are not. Id. Specifically, the court stated as follows:
To ensure that tax revenues are allocated to DURA [Denver Urban Renewal Authority] based solely upon the increased valuation of property because of the project , section 31-25-107(9)(e) provides that in the event there is a general reassessment of taxable property within any county including any part of the urban renewal project, the valuation of property within the project area shall be proportionately adjusted in accordance with such assessment. The tax allocation structure has been carefully drafted so that there is a direct relationship between the increased valuation of property within the project area , and thus, increased ad valorem tax revenues, and the project financed by the bond issue . Id. (emphasis added); see also Bd. of Comm'rs v. City of Broomfield , 7 P.3d 1033, 1036 (Colo. App. 1999). The court further stated that "[t]he portion of tax revenues allocated to DURA represent the amount generated by virtue of increased property valuation which would not have existed but for the project." Byrne , 618 P.2d at 1387 (emphasis added).
¶ 117 Though the majority is correct that Byrne "was addressing whether TIF was constitutional, not the question of statutory interpretation presented to us," supra ¶ 95, and it used the terms "project area" and 507 P.3d 1053 "plan" loosely, in my view, Byrne is still consistent with the Reference Library's differential treatment of direct and indirect benefits. While value changes directly caused by the urban renewal project are allocated to the increment, value changes caused by general market conditions — i.e., market perceptions that properties located in a TIF plan are more or less desirable or valuable — are proportionately allocated to the base and increment. 2 Assessors’ Reference Library at 12.15.
¶ 118 I also disagree with the majority's conclusion that the Reference Library's distinction between direct and indirect benefits eviscerates the URL's express purpose of rehabilitating slum or blighted areas. The majority concludes that the Reference Library's "proportionate" allocation of indirect benefits "results in a very small percentage (or sometimes none) of the increase in value within urban renewal areas being allocated to the urban renewal authority." Supra ¶ 79. But the Assessor explained why there has been little or no allocation of the indirect benefits to the renewal authority:
It is important to remember that the URL's purpose is to fix blight in urban areas, § 31-25-102, C.R.S. and in several of the TIF areas AURA [Aurora Urban Renewal Authority] presents, nothing has been done to fix this blight. For example, in TIF Area 4406 ..., AURA itself confirmed that no redevelopment has even started in this area despite the TIF being established in 2014.... Similarly, for TIF Area 4407 ..., AURA confirmed that no redevelopment occurred on this property between the TIF area's establishment in 2014 until sometime after a redevelopment contract was signed in April 2019.
Thus, the Assessor warns, "an urban renewal authority could simply attach TIF provisions to tracts of property and then do nothing, while reaping the benefit of market value increases."
¶ 119 While I do not purport to know the best method for calculating TIF revenues or the best way to incentivize urban renewal, I do not believe we have been tasked with that responsibility. The General Assembly has instead delegated that responsibility to the Administrator. § 31-25-107(9)(h) ; § 39-2-109(1)(e). And Chapter 12 of Volume 2 of the Reference Library — the TIF methodology — was reviewed and approved by the Board at a public hearing on October 5, 2016, and later reviewed by the General Assembly for compliance with the URL. As I see it, the majority's disapproval of the Reference Library's distinction between direct and indirect benefits crosses the line into the area of public policy. See Town of Telluride v. Lot Thirty-Four Venture, L.L.C. , 3 P.3d 30, 38 (Colo. 2000) ("It is not up to the court to make policy or to weigh policy.").
¶ 120 I therefore respectfully concur in part and dissent in part.
--------
Notes:
[1] The defendants argue that a mixed standard of review applies. The Levine v. Katz division explained,
[a]n appellate court applies a mixed standard of review to motions to dismiss for lack of subject matter jurisdiction. The trial court's factual findings are reviewed under the clear error standard and are binding unless so clearly erroneous as not to find support in the record. But the trial court's legal conclusions are reviewed do novo.
192 P.3d 1008, 1012 (Colo. App. 2006) (citations omitted). In ruling on the defendants’ motion to dismiss, the district court did not hold an evidentiary hearing or make factual findings. Instead, the district court decided this question on the basis of the plaintiffs’ complaint. Therefore, there are no adjudicated facts to review for clear error. Instead, the question is one of law, which we review de novo. Ainscough v. Owens , 90 P.3d 851, 854 (Colo. 2004).
[2] The Administrator further argues that the Metro Districts have not shown how their alleged injury arises from the actions of the Administrator. The Administrator prepares and publishes the manner and methods by which the Assessor calculates the base value and incremental revenue. § 31-25-107(9)(h), C.R.S. 2021. The Assessor is required by law to follow the Reference Library. Huddleston v. Grand Cnty. Bd. of Equalization , 913 P.2d 15, 17 (Colo. 1996). Accordingly, the Metro Districts’ alleged injury arises from the Reference Library as published by the Administrator. So, we reject this argument.
[3] We note that United States Court of Appeals for the Tenth Circuit recently reframed the political subdivision standing doctrine as a merits issue rather than a threshold jurisdictional question. Kerr v. Polis , 20 F.4th 686 (10th Cir. 2021). We remain bound by the framework adopted by the Colorado Supreme Court in Martin v. District Court , 191 Colo. 107, 109, 550 P.2d 864, 866 (1976). See In re Estate of Ramstetter , 2016 COA 81, ¶ 40, 411 P.3d 1043.
[4] We directed the parties to address the following questions at oral argument. They did so.
1. What is the statutory support, if any, for the distinction between direct and indirect benefits made in the Assessors’ Reference Library (ARL)? See 2 Div. of Prop. Tax'n, Dep't of Loc. Affs., Assessors’ Reference Library § 12, at 12.15 (rev. Oct. 2021).
2. Is that distinction permitted by the Urban Renewal Law?
3. Assume that properties are in a blighted area and that an urban renewal plan is adopted for that area. After the urban renewal plan is adopted, but before any construction or remediation, the properties in the urban renewal area increase substantially in value. Assume further that other than the adoption of the urban renewal plan, there is no explanation for the increase in value (i.e., comparable properties adjacent to the plan area have not significantly increased in value). What is the mechanism that allows little to no appreciation to be attributed to the Increment Value under these circumstances?
4. Whatever that mechanism may be, is it supported by law?
[5] The Deputy Director of the Division of Property Taxation attested by affidavit that the 2016 revisions to Volume 2, Chapter 12 of the Reference Library "were reviewed and approved by the Office of Legislative Legal Services." The record does not reflect what this review consisted of, the standard of review applied, or the results of the review. More importantly, as discussed above, the allocation procedures amended in 2016 are different from the allocation procedures challenged on appeal. The record does not reflect whether the currently challenged allocation procedures ever were reviewed or approved by the Office of Legislative Legal Services.
[6] We likewise conclude that the Assessor's reliance on Board of Commissioners v. City of Broomfield , 7 P.3d 1033, 1036 (Colo. App. 1999), is misplaced. The City of Broomfield division held that the county was not deprived of property tax revenue because "[o]nly the increases in the value of a property over the assessed base values go to the renewal authority." Id. The Reference Library's distinction between direct and indirect benefits goes beyond ensuring that the county receives all the tax revenue it would be entitled to but for the urban renewal plan. Instead, this distinction creates a windfall for counties who reap the indirect benefits of an urban renewal plan at the expense of the viability of TIF and urban renewal.
--------